Gary L. SAMPLE, on behalf of himself and all persons similarly situated on Counts I, IV, V, and VI and on behalf of Nominal Defendant Randall Bearings, Inc., on Counts II, III, and VI, Plaintiff,

v.

Kent P. MORGAN, Jeffrey L. Hager, David L. Wierwille, Kenneth C. Harrod, Stephen M. Richmond, Baker & Hostetler LLP, and Joseph P. Boeckman, Defendants,

and

Randall Bearings, Inc., Nominal Defendant.

C.A. No. 1214–VCS.

Court of Chancery of Delaware.

Submitted: Sept. 6, 2007.
Decided: Nov. 27, 2007.

See also 914 A.2d 647.

Pamela S. Tikellis, Esquire, Robert J. Kriner, Jr., Esquire, A. Zachary Naylor, Esquire, Daniel J. Brown, Esquire, Chimicles & Tikellis LLP, Wilmington, Delaware, Attorneys for Plaintiff.

David A. Jenkins, Esquire, Michele C. Gott, Esquire, Smith Katzenstein & Furlow LLP, Wilmington, Delaware, Attorneys for Defendants Baker & Hostetler LLP and Joseph P. Boeckman.

James J. Merkins, Jr., Esquire, Blank Rome LLP, Wilmington, Delaware; Attorneys for Kent P. Morgan, Jeffrey L. Hager, and David L. Wierwille.

Joanne Pileggi Pinckney, Esquire, Susan E. Poppiti, Esquire, Pinckney Harris & Poppiti, LLC, Wilmington, Delaware, Attorneys for Defendants Kenneth C. Harrod and Stephen M. Richmond.

S. Mark Hurd, Esquire, Samuel T. Hirzel, II, Esquire, Morris, Nichols, Arsht & Tunnel, Wilmington, Delaware, Attorney for Nominal Defendant Randall Bearings, Inc.

## OPINION

STRINE, Vice Chancellor.

### I. *Introduction*

The question presented is a straightforward one. May a corporate lawyer and his law firm be sued in Delaware as to claims arising out of their actions in providing advice and services to a Delaware public corporation, its directors, and its managers regarding matters of Delaware corporate law when the lawyer and law firm: i) prepared and delivered to Delaware for filing a certificate amendment under challenge in the lawsuit; ii) advertise themselves as being able to provide coast-to-coast legal services and as experts in matters of corporate governance; iii) provided legal advice on a range of Delaware law matters at issue in the lawsuit; iv) undertook to direct the defense of the lawsuit; and v) face well-pled allegations of having aided and abetted the top managers of the corporation in breaching their fiduciary duties by entrenching and enriching themselves at the expense of the corporation and its public stockholders? The answer is yes.

The lawyer and law firm's conduct in arranging the filing of the certificate amendment in Delaware satisfies both § 3104(c)(1) and § 3104(c)(3) of Delaware's long-arm statute.[1] That Certificate Amendment was integral to an alleged scheme by the top managers of the corporation to have issued to themselves at an unfair price a large bloc of voting stock that would secure their control over the

---

1. 10 *Del. C.* § 3104.

corporation. Thus, the scheme not only involved an act in Delaware, it also involved an injury in Delaware to the Delaware corporation.

Likewise, it is constitutionally permissible to exercise jurisdiction over the lawyer and his law firm. Having directed their legal practice toward Delaware by regularly providing advice about Delaware law matters to the corporation, these defendants should have reasonably expected that they might face suit here if the managers and directors they were advising were sued for a breach of fiduciary duty related to that advice. These sophisticated defendants had to know of the strong interest Delaware has in ensuring that Delaware corporations and their stockholders have access to this court to hold corporate fiduciaries and their advisors accountable for honoring their legal and fiduciary obligations. Given their Delaware-directed conduct and the tight nexus between that conduct and this suit, these defendants have no basis to object to having to appear in Delaware to defend this suit.

Their motion to dismiss for lack of personal jurisdiction will therefore be denied.

## II. *Factual Background*

These are the relevant facts from the record, with inferences drawn in the plaintiff-friendly manner required in this procedural context.[2]

In 2004, the three "Top Managers" of Randall Bearings, Inc., an Ohio-headquartered bronze ball bearings concern incorporated in Delaware, received 200,000 shares of the company's stock.[3] Although the Top Managers' right to ownership of the shares was subject to a vesting schedule, the shares could be voted immediately, had dividend rights, and all of the shares vested immediately in the event of a "proposed or actual change in control" of the company.[4] The 200,000 shares amounted to nearly a third of the company's voting power. The Top Managers comprised three of the board of directors' five members.

The Top Managers paid a total of $200 in exchange for the shares, $199,800 less than if the corporation had not amended its certificate of incorporation to lower the par value of its shares from $1.00 to $0.001. That "Certificate Amendment" was put to the Randall Bearings stockholders at the same time as the stockholders voted to authorize an "Equity Incentive Plan," by which up to 200,000 shares of stock could be issued by the board to employees or officers for the purposes of— or so the stockholders were told—"attracting and retaining key employees for the company." [5]

Before the full board and stockholders approved these items, the Top Managers sought advice from the company's outside counsel, defendant Joseph Boeckman of the Columbus, Ohio office of defendant Baker & Hostetler LLP. Although being paid at all relevant times by Randall Bearings to act as the company's counsel, Boeckman developed options for the Top Managers that would facilitate their objectives of voting control. These options always involved in part the issuance of

---

2. *Outokumpu Eng'g Enter., Inc. v. Kvaerner EnviroPower, Inc.,* 685 A.2d 724, 727 (Del.Super.1996).

3. The Top Managers included CEO Kent P. Morgan, Treasurer and CFO David L. Wierwille, and Vice President of Manufacturing Jeffrey L. Hager. Kenneth C. Harrod and Stephen M. Richmond rounded out the board

at the time the grant of shares under the Equity Incentive Plan was approved.

4. Naylor Aff. Ex. 19.

5. Third Amended Class Action and Derivative Complaint ("Compl.") Ex. 1, at 4.

shares by the company to the Top Managers. In providing his advice to the Top Managers, Boeckman noted that the amount of shares that the Top Managers would need to be a serious obstacle to any change of control exceeded the amount of shares that boards were typically authorized to grant to employees in compensation plans.

In the end, Boeckman and the Top Managers agreed to seek board and stockholder approval for a Certificate Amendment that would, as noted, lower the par value of the company's stock from $1.00 to $0.001 and for an Equity Incentive Plan that would authorize the board to issue up to 200,000 shares—or some 31.7% of the company's voting power—to officers and managers. The pled facts suggest that the Top Managers and Boeckman intended from the get-go for all 200,000 shares to be issued to the three Top Managers—100,-000 shares to Morgan, 75,000 to Hager, and 25,000 to Wierwille—so as to accomplish their entrenchment objectives.[6] The reduction in par value would allow the Top Managers to receive the shares for a total of $200 rather than $200,000. This reduction, one can infer, was not chump change to the Top Managers, who later sought and accomplished having the company pay the taxes they owed on their receipt of the shares.

At the time Boeckman was providing advice about these issues, the Top Managers were insecure because the company's former CEO and largest stockholder had died. A relative of the founder and Chairman of the Board at the time of his death, Bruce Dickerson, owned a bloc of nearly 30%. The leader of the Top Managers, defendant Kent Morgan, had succeeded Bruce Dickerson as Chairman and CEO and had joined the company only a few years earlier.

The Top Managers feared that the Dickerson stock could end up in hands that were unfriendly to management. Boeckman aided the Top Managers in their efforts to manage this risk. Boeckman sent two memoranda to Morgan in late May of 2003. At first, Boeckman recommended securing an agreement from Bruce Dickerson's widow, Susan Dickerson, to put the family's shares in a voting trust whereby she would pledge support for management. At that point, Boeckman contemplated using a combination of a voting trust and the grant of a smaller, but still sizable, number of shares to the Top Managers as a method for achieving their entrenchment objectives.

When the voting trust option became either unattractive or unavailable, Boeckman altered tactics. For one thing, he then recommended that a much larger grant of shares—the 200,000 shares ultimately granted—be authorized for issuance to the Top Managers.[7] When the Randall Bearings board approved the Certificate Amendment and the Equity Incentive Plan some months later, neither the Top Managers nor Boeckman—who was acting as the board's counsel—disclosed the memoranda Boeckman had written to the Top Managers discussing the options they had to achieve their entrenchment objectives. Nor did they disclose to the non-management director who was present that the number of shares to be included in

---

6. Compl. ¶ 30; *see* Naylor Aff. Ex. 7.

7. The second of the two memoranda from Boeckman to Morgan, sent May 22, 2003, is substantially identical to the first, sent two days earlier. *Compare* Compl. 26 *with id.* 29. It downplays the voting control protection afforded against third parties, and omits discussion of the smaller size of most equity incentive plans and the voting trust with Susan Dickerson, subjects that were all covered in the May 20, 2003 memo. *Id.* 26, 29, 30.

the Equity Incentive Plan far exceeded that which was standard.[8]

Boeckman also helped the Top Managers ensure that the Dickerson bloc ended up in hands friendly to management. Around the same time as the Randall Bearings Board approved the Certificate Amendment and Equity Incentive Plan, Boeckman told the board that Susan Dickerson wanted to sell her stake in Randall Bearings. Boeckman immersed himself in the negotiations over the terms of sale for Susan Dickerson's bloc of shares to the A Cubed Corporation. Once billed to the court by counsel to the defendants as "an entity that the Dickersons were familiar with" which "do[es]n't have a relationship with the company,"[9] the defendants finally and belatedly admitted—through counsel for the nominal defendant, Randall Bearings, at oral argument on this motion— that A Cubed is affiliated with Randall Bearings' principal supplier of raw materials, Concast.[10] Taken together with the contemplated grant of 200,000 shares to the Top Managers, the sale of the 127,442-share Dickerson bloc to A Cubed would place a majority of Randall Bearing's voting power under the control of the Top Managers and A Cubed, if they acted concertedly.

In this respect, A Cubed's supplier relationship was not the only tie that would bind together the 58% voting bloc. Notably, the arrangement with A Cubed also involved a contractual commitment on Randall Bearings' part not to issue more than 200,000 shares of stock during the next five years. That number was not coincidental. It was precisely the larger number of shares the Top Managers sought to have issued to them under the Equity Incentive Plan once the option of securing a voting trust agreement with Susan Dickerson had evaporated. Also in connection with the negotiations over the sale of the Dickerson bloc, Boeckman had the Top Managers execute a "Term Sheet" reflecting an agreement in principle with the sole owner of A Cubed, Alfred Barbour, that was signed on November 21, 2003, along with the Stock Purchase Agreement.[11] Months before stockholder approval, the Term Sheet specified that the 200,000 shares would be distributed to the Top Managers in certain proportions, stating that those shares "will be awarded" to the Top Managers.[12] Of course, as of November 21, 2003, the Randall Bearings stockholders had not yet been informed of, much less voted to approve, the Equity Incentive Plan.

The Term Sheet also contemplated two future agreements among the Top Managers, Barbour, and A Cubed to be executed when the Top Managers were awarded stock under the Equity Incentive Plan. One would require the Top Managers to vote their shares for a board nominee of Barbour's choosing if he requested they do so. Another agreement governed the future sale of Randall Bearings' stock by the

---

8. Randall Bearing's board then included two members who were not managers. One was Susan Dickerson, who had stopped attending meetings by that point because she was feuding with the company over a contractual benefits package. The other was Kenneth Harrod, who had retired in 1997 as a senior executive at Randall Bearings after 30 years of service.

9. Transcript of Oral Argument on Defendant's Motion to Dismiss the Second Amended Complaint (Nov. 6, 2006) ("Nov. 6, 2006 Tr.") at 15, 16–17.

10. Transcript of Oral Argument on Defendant's Motion to Dismiss the Third Amended Complaint (Aug. 29, 2007) ("Aug. 29, 2007 Tr.") at 59–60.

11. Naylor Supp. Aff. Ex. 16.

12. *Id.*

signatories to the Term Sheet. This "Co–Sale Rights Agreement" included a term prohibiting any of the Top Managers, A Cubed, or any affiliate of A Cubed from selling less than all of its stock to a third party.[13] Another related term provided that if any party covered by that restriction found a buyer for its holdings then all parties would have equal rights to sell to that buyer for the same price and on the same terms and conditions. It also granted an assignable option to the Top Managers that would allow them to purchase the Randall Bearings shares owned by A Cubed in the event Barbour ever transferred away his majority voting control over A Cubed.[14]

When Boeckman reported the consummation of the A Cubed transaction to the board, the meeting minutes indicate he told them that: "The company's participation in the transaction was solely to facilitate the transaction."[15] It is not clear how informed the only non-management director in attendance was about these side arrangements.

After the board approved the Certificate Amendment and Equity Incentive Plan, Boeckman prepared and sent to Morgan a checklist listing what needed to be done to implement the Equity Incentive Plan.[16] That checklist included executing stock award agreements and stock certificates reflecting the 200,000 shares the Top Managers would receive.[17] This was in March 2004, two and a half months *before* Randall Bearings held a meeting for its stockholders to vote on the Certificate Amendment and the Equity Incentive Plan. Boeckman played the key role in drafting the proxy statement for that meeting, too.

The proxy statement is remarkable for what it did not say. It told the Randall Bearings stockholders that the purpose of the Equity Incentive Plan was to enable the company to "attract[ ] and retain[ ] key employees."[18] But it failed to mention that the Top Managers already contemplated that all 200,000 shares would be granted to the Top Managers, leaving no shares left for the "attract[ion]" of anyone, and no shares left to help "retain[ ]" any but the three Top Managers on the board itself. Likewise, the proxy statement failed to disclose anything about the contractual arrangements Randall Bearings had entered into with A Cubed. By those arrangements, Randall Bearings had bound itself not to issue any more equity for five years other than the shares contemplated by the Equity Incentive Plan. As important, the proxy statement did not disclose that A Cubed—an affiliate of Randall Bearings' major supplier—and the Top Managers would, if their plans were implemented, control over 50% of the company's voting power. And, as noted, the A Cubed agreements evidenced a plan for

13. *Id.* For the purposes of this provision, the Co–Sale Rights Agreement treats A Cubed and all of its affiliates as a single stockholder.

14. Although the Term Sheet mentions an option being granted in favor of the Top Managers and the company, its other terms seem to make clear that the Top Managers control its exercise. For example, the option was assignable by the Top Managers to a third party. Moreover, the board minutes for the November 17, 2003 meeting indicate that the company's involvement in the transaction with A Cubed was "to make certain representations in the stock purchase agreement concerning corporate matters beyond the knowledge of the Dickerson Family ... solely to facilitate the transaction." Naylor Aff. Ex. 10.

15. Naylor Aff. Ex. 10.

16. Naylor Aff. Ex. 7. The checklist was attached to an email sent from Boeckman to Morgan on March 11, 2004.

17. *Id.*

18. Compl. Ex. 1, at 4.

the immediate grant of all the Equity Incentive Plan shares to the Top Managers and the Top Managers' contemplated right to purchase A Cubed's shares if A Cubed sought to sell its shares. These subjects were not addressed at all in the proxy statement.

After the stockholders approved the Certificate Amendment and the Equity Incentive Plan in a close vote, a Baker & Hostetler employee under Boeckman's supervision played the key role in ensuring the Certificate Amendment he drafted was filed in Delaware with the Secretary of State.[19] The pled facts support the inference that Boeckman's firm, Baker & Hostetler, engaged the Corporation Service Company ("CSC") to accomplish the filing. Indeed, a list of "Action Items" Boeckman himself prepared for Randall Bearings identified himself as the "Responsible Party" for filing the Certificate Amendment[20] and other evidence belatedly produced in discovery demonstrates that Baker & Hostetler transmitted the Certificate Amendment to CSC in Delaware for filing.[21]

Once the Certificate Amendment and the Equity Incentive Plan became effective, Boeckman then acted as the sole source of advice to the board committee that was charged with determining how and on what terms to allocate the shares authorized by the Equity Incentive Plan. Boeckman presented the committee with a proposal to grant all 200,000 shares to the Top Managers.[22] After brief meetings at which Boeckman provided the only advice, the committee agreed to do what he recommended—grant the Top Managers all the shares, with immediate voting power and dividend rights, and accelerated vesting in the event of a change of control. Not only that, the committee decided to have the company pay the $930,000 in taxes that the Top Managers owed on the shares they had received. This was a sizable sum that Randall Bearings could not pay out of available funds. Rather, it was forced to take out a five year loan to acquire the funds. During the committee's deliberations, Boeckman did not disclose his discussions with or memoranda to the Top Managers regarding their voting control objectives.

In a prior decision in this case, I denied the defendant-directors' motion to dismiss.[23] In that decision, I concluded that the plaintiff Sample had pled viable claims for breach of fiduciary duty against all the directors of Randall Bearings who served during the period relevant to the grant of 200,000 shares to the Top Managers. In so holding, I noted that the amended complaint pled facts supporting the inference "that the [Certificate] Amendment and the Equity Incentive Plan resulted from a conscious scheme of entrenchment and personal self-enrichment by the [Top Managers], facilitated by the advice of Boeckman, which was purposely concealed from the Randall Bearing stockholders when they were asked to vote on the Amendment and the Plan."[24]

After the court's decision, the plaintiff sought to further amend the complaint to

19. *See* Naylor Supp. Aff. Exs. 1, 2 (evidencing "preparations for and transmissions with the CSC regarding filing certificate of amendment with the Delaware Secretary of State"); Boeckman Aff. ¶ 10 (acknowledging he "supervised all legal services performed in connection with the transactions giving rise to" the claims in this suit).

20. Naylor Aff. Ex. 7.

21. Naylor Supp. Aff. Exs. 1, 2.

22. Naylor Aff. Ex. 13.

23. *Sample v. Morgan,* 914 A.2d 647 (Del.Ch. 2007).

24. *Id.* at 675.

state claims for aiding and abetting breaches of fiduciary duty against Boeckman and Baker & Hostetler.[25]

Boeckman and Baker & Hostetler have now moved to dismiss the claims against them solely on the grounds that personal jurisdiction over them cannot be had in this court. Before addressing that motion's legal merits, it is worth noting that Boeckman and Baker & Hostetler were involved in this litigation long before the third amended complaint added them as parties.

### III. *The Litigation To Date*

Since the inception of this litigation, Boeckman and Baker & Hostetler have played a major role in shaping the defense strategy, although no Baker & Hostetler lawyer sought admission pro hac vice. Oddly, until a few months ago, counsel for Randall Bearings itself (a nominal party in this derivative and class action) and for the defendant-directors (who themselves were until recently represented by a single counsel purporting to represent both the Top Managers and the outside directors) seem to have relied almost entirely upon Baker & Hostetler to do the key work required in connection with the production of documents. The defendant-directors' compliance with their discovery obligations has been, to put it mildly, woefully and repeatedly inadequate.

A full recitation of the repeated discovery violations committed by the defendants in this litigation could go on for dozens of pages. One glaring example is worth mentioning. Before this court issued its first decision rejecting the defendant-directors' motion to dismiss, the defendant-directors had been under an obligation to produce documents, including documents relating to the Dickerson shares and any arrangements made in connection with the sale of those shares. But it was not until July 20, 2007—six months after the prior decision was issued—that the defendants finally produced documents revealing the Top Managers' negotiations over voting, sale rights, and other issues with A Cubed. Even worse, the defendants continued to dribble out documents, and only in the same time period did they finally produce documents indicating that the Top Managers, Boeckman, and A Cubed had already planned for the Top Managers to receive all 200,000 shares under the Equity Incentive Plan—with immediate voting and dividend rights—before the Randall Bearings stockholders were asked to vote on the Plan. The omission of these material documents from the earlier production has, to date, not been explained.

### IV. *A "Coast–To–Coast" Platform*

This substantial direction of the legal work by Baker & Hostetler for its clients regarding Delaware law matters is, of course, not surprising. Baker & Hostetler touts itself as a "Counsel to Market Leaders," including businesses that "are leaders globally, nationally, regionally[,] and locally." [26] With the strength of being "one of the nation's largest law firms" with "more than 600 lawyers" and a "unique [10 office] coast-to-coast platform" consisting of "[c]oordinated national and international practice groups," Baker & Hostetler advertises itself as being able to handle the full range of any corporation's legal needs, regardless of its location in the United States.[27] In fact, as to corporations in

---

**25.** *See* Compl. ¶¶ 91, 92.

**26.** Baker Hostetler—About Us, http://www.bakerlaw.com/AboutUs.aspx?Abs_WP_ID=56

b84b31–3f37–41eb–8960–e42b349976f6 (last visited Nov. 27, 2007).

**27.** *Id.*

particular, Baker & Hostetler says that it has "200 business lawyers in all ten of [its] offices [who] work with clients in every region in the United States and many parts of the world providing comprehensive and experienced business counsel to large and small . . . corporations of . . . all sizes." [28] As to corporate law itself, Baker & Hostetler promotes as "practice strengths" its expertise in understanding the "evolving requirements and actions necessary to maintain or achieve compliance with fiduciary duty obligations . . . and [corporate] disclosure requirements." [29]

## V. *The Motion To Dismiss*

Boeckman and Baker & Hostetler have not moved to dismiss the claims against them under Rule 12(b)(6). Rather, they have only challenged the complaint on the ground that they are not subject to personal jurisdiction in Delaware.

Frankly, their opening brief was an odd one in that it entirely ignored the fact that they had prepared the Certificate Amendment and caused it to be filed in Delaware. In support of that brief, Boeckman filed an affidavit that, although true in the most literal of senses, seems intended to distract attention from Baker & Hostetler's role in the Certificate Amendment filing. In Boeckman's words:

> 10. I was the Baker Hostetler attorney who supervised all legal services performed in connection with the transactions giving rise to Plaintiff's alleged claims in the above captioned matter.
>
> * * *

13. I had no cause to enter Delaware in connection with my representation, *nor did I file any documents with any court or agency in Delaware in connection with this representation.* [30]

When the plaintiff's answering brief was filed, it understandably featured the Certificate Amendment. After that brief was submitted, more late-produced documents came in when Baker & Hostetler finally produced its billing records. The records demonstrated that a paralegal under Boeckman's supervision at Baker & Hostetler sent the Certificate Amendment to CSC in Delaware for filing. [31] Confronted with the reality—which they might have thought to disclose up-front—that they not only drafted the Certificate Amendment, but sent it to CSC *in Delaware* for filing, the moving defendants retreated to the contention that although they sent the Certificate Amendment to CSC in Delaware, CSC was the registered agent who actually filed the Certificate Amendment with the Secretary of State. Why this matters as a jurisdictional matter, they do not make clear.

Recognizing that their direct role in filing the Certificate Amendment undercut most of the arguments made in their opening brief, the moving defendants then resorted to a panoply of implausible and strained new arguments, which, if accepted, would undermine the purposes of our state's long-arm statute and the ability of stockholders of Delaware corporations to avail themselves of this court as a forum to hold parties responsible for aiding and abetting breaches of fiduciary duty. Con-

---

28. Baker Hostetler—Practice Strengths—Business, http://www.bakerlaw.com/BDs.aspx?Abs_BD_ID=116896b2–50a8–4fde–88c9–21f4fa0cab48 (last visited Nov. 27, 2007).

29. Baker Hostetler—Practice Strengths—Business—Corporate Governance, http://www.bakerlaw.com/BDs.aspx?Abs_BD_ID=9

fd65ea7–8a93–4a79–afa9–acceafd19e24 (last visited Nov. 27, 2007).

30. Boeckman Aff. ¶¶ 10, 13 (emphasis added).

31. Naylor Supp. Aff. Ex. 1.

sistent with the pattern of this litigation, it turns out that the briefs on this motion were drafted by attorneys at Baker & Hostetler, but filed and signed only by Delaware counsel, who argued the motion. At oral argument, Delaware counsel conceded that at least one of the arguments in the Baker & Hostetler briefs lacked any plausible basis in law or logic.[32]

Distilled down, the arguments made by Boeckman and Baker & Hostetler go essentially as follows. For starters, they note that all the legal work they did was done in offices of Baker & Hostetler outside Delaware. The only potentially relevant act that they directed toward Delaware itself as a physical place was the transmission of the Certificate Amendment to CSC in Delaware. But that action was, they say, not sufficient to constitute a qualifying act under the long-arm statute because the reduction in the Top Managers' cost of acquisition from $200,000 to $200 was simply a nice extra of the overall scheme alleged by the plaintiff. Absent the Certificate Amendment, the approval of the Equity Incentive Plan would still have enabled the Top Managers to obtain voting control over 200,000 shares, although at a much richer price.

In addition, they argue that because the Certificate Amendment was filed by the company, albeit by Baker & Hostetler sending it to CSC, the filing cannot be attributable to any of the Top Managers with whom Boeckman and Baker & Hostetler allegedly conspired. Rather, the filing was a corporate act, and a corporation

cannot, say the moving parties, conspire with its own officers, directors, and lawyer. In that same vein, Boeckman and Baker & Hostetler argue that a lawyer who is simply acting for a client with only the hope of getting paid for his work cannot conspire with that client and therefore the conspiracy theory of jurisdiction cannot be used against the lawyer to hold him accountable for acts of the client in the forum state.

Finally, Boeckman and Baker & Hostetler contend that it would offend notions of due process for them to have to defend this suit in Delaware. Although they admit to having acted as outside general counsel to a Delaware corporation on matters of Delaware law as to the very matters at dispute in this lawsuit, and to regularly giving clients advice on matters of Delaware law, the fact that their "coast-to-coast" platform of offices does not include a Delaware office makes it constitutionally offensive for them to have to face suit in this state, even as to claims challenging the propriety, as a matter of Delaware law, of board actions on which they gave advice about Delaware law and of a Certificate Amendment they caused to be filed in Delaware.

## VI. Legal Analysis

In considering a motion to dismiss for lack of personal jurisdiction under Court of Chancery Rule 12(b)(2), I am not limited to the pleadings. Rather, I am "permitted to rely upon the pleadings, proxy statement, affidavits, and briefs of the parties in order to determine whether

32. That argument contended that because the director-defendants, including the Top Managers, had been served under 10 *Del. C.* § 3114, the plaintiff could not utilize the so-called "conspiracy" theory of jurisdiction to obtain jurisdiction over Boeckman and Baker & Hostetler under 10 *Del. C.* § 3104. Why this was so was not something counsel for Boeckman and Baker & Hostetler could ex-

plain. And for good reason, it makes no sense. The fact that the director-defendants were served under § 3114 does not mean that they could not have engaged in a civil conspiracy with a co-conspirator who was not subject to service under § 3114 in order to determine whether that person could be served under the long-arm statute.

the defendants are subject to personal jurisdiction."[33]  In evaluating the record, I must draw reasonable inferences in favor of the plaintiff.[34]

There are two legal questions to be answered in considering a motion under Rule 12(b)(2).  The first is whether there is a statutory basis for serving the defendants with process.[35]  The second is whether this court's exercise of personal jurisdiction over the defendants is consistent with the Due Process Clause of the Fourteenth Amendment of the United States Constitution.[36]

Here, the first question is, I suppose, modestly more difficult to answer than the second, which is not close at all.  Before beginning, it is useful to reiterate that the moving defendants have not challenged the viability of the claims pled against them.  They accept the proposition that the plaintiff has alleged well-pled facts supporting the inference that Boeckman consciously assisted the Top Managers in conceiving and implementing a scheme to enrich and entrench the Top Managers at the expense of Randall Bearings and its stockholders.  The sole determination I must now make is whether the moving defendants must defend that claim on the merits in this court.

Boeckman and Baker & Hostetler were served under Delaware's long-arm statute, 10 *Del. C.* § 3104.  That statute provides in pertinent part that:

(c) As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:

(1) Transacts any business or performs any character of work or service in the State; [or]

* * *

(3) Causes tortious injury in the State by an act or omission in this State.... [37]

The Delaware Supreme Court has made clear that trial courts must give a broad reading to the terms of the long-arm statute, in order to effectuate the statute's intent to ensure that this state's court may exercise jurisdiction to the full limits permissible under the Due Process Clause.[38]  In other words, the Supreme Court has instructed that trial courts should permit service under § 3104 if the statutory language plausibly permits service, and rely upon a Due Process analysis to screen out uses of the statute that sweep too broadly.[39]

---

**33.** *Crescent/Mach I Partners, L.P. v. Turner,* 846 A.2d 963, 974 (Del.Ch.2000).

**34.** *Outokumpu Eng'g Enter., Inc.,* 685 A.2d at 727.

**35.** *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.,* 871 A.2d 428, 438 (Del.2005).

**36.** *Id.*

**37.** 10 *Del. C.* § 3104.

**38.** *See Hercules Inc. v. Leu Trust and Banking (Bahamas) Ltd.,* 611 A.2d 476, 480–81 (Del. 1992) ("[Section] 3104(c) is to be broadly construed to confer jurisdiction to the maximum extent possible under the Due Process Clause.") (internal citations omitted).

**39.** *See Chandler v. Ciccoricco,* 2003 WL 21040185, at *10–11 (Del.Ch.2003) ("Under [the *Hercules* ] mandate, my task should be to give the words of the statute a liberal construction and to conclude that [a filing in Delaware] is a transaction of business if that can be reasonably done.  Any problems of overbreadth by such a liberal construction can be policed by application of the minimum contacts analysis under the due process clause of the Fourteenth Amendment."); *cf. Assist Stock Mgmt. L.L.C. v. Rosheim,* 753 A.2d 974, 980 (Del.Ch.2000) (advocating the use of the Due Process analysis to temper potentially overbroad application of the terms of Delaware's director consent statute, 10 *Del. C.* § 3114).

Here, the parties initially joined issue over whether Boeckman and Baker & Hostetler could be served under § 3104 because well-pled facts support the inference that Boeckman engaged in concerted activity with the Top Managers to entrench and enrich the Top Managers at the unfair expense of Randall Bearings and its stockholders. As an element of that scheme, Boeckman and the Top Managers proposed and obtained approval for the Certificate Amendment, which was filed in Delaware. That Certificate Amendment permitted the Top Managers to receive the disputed shares for only $200, saving themselves $199,800. Using the so-called conspiracy theory of jurisdiction, the plaintiff argues that the act of filing the Certificate Amendment can be imputed to Boeckman and Baker & Hostetler, thereby satisfying both § 3104(c)(1) and § 3104(c)(3) of the long-arm statute.

As things turn out, the inquiry is much simpler. Discovery has since revealed that Boeckman and Baker & Hostetler themselves prepared and sent the Certificate Amendment to CSC in Delaware for filing with the Secretary of State.[40] That is, the moving defendants themselves directly transacted business in Delaware for purposes of § 3104(c)(1).[41] The involvement of a defendant in arranging, either directly or through an agent such as CSC, for the filing of a corporate instrument in Delaware that facilitated transactions under challenge in litigation in this court has been repeatedly recognized as sufficient to constitute the transaction of business under § 3104(c)(1).[42] The Certificate Amendment is directly at issue in the claims against the moving defendants, and therefore the use of § 3104(c)(1) to serve the moving defendants is permissible.[43] Likewise, the moving defendants' filing of the Certificate Amendment in Delaware satisfies § 3104(c)(3) because that action injured Randall Bearings, a Delaware corporation. When a Delaware corporation is financially injured by faithless conduct of its directors, the corporation is injured in its legal home, this State, for purposes of § 3104(c)(3). As this court has previously observed:

> When conspirators commit a breach of fiduciary duty against a Delaware corpo-

---

40. Naylor Aff. Exs. 1, 2.

41. *Benihana of Tokyo, Inc. v. Benihana, Inc.,* 2005 WL 583828, at *6, *8 (Del.Ch.2005); *Gibralt Capital Corp. v. Smith,* 2001 WL 647837, at *6 (Del.Ch.2001).

42. *E.g., In re General Motors (Hughes) S'holder Litig.,* 2005 WL 1089021, at *22 (Del.Ch. 2005) (certificate of merger); *Benihana,* 2005 WL 583828, at *8 (certificate of designation); *Chandler,* 2003 WL 21040185, at *11 (certificate of designation); *Parfi Holding AB v. Mirror Image Internet, Inc.,* 794 A.2d 1211, 1229 (Del.Ch.2001) (charter amendments), *rev'd on other grounds,* 817 A.2d 149 (Del.2002); *Gibralt,* 2001 WL 647837, at *6 (charter amendment and certificate of designation); *Kahn v. Lynch Commc'n Sys., Inc.,* 1989 WL 99800, at *4 (Del.Ch.1989) ("negotiating and consummating the merger at issue" constituted transaction of business under 10 *Del. C.*

§ 3104(c)(1) when the merger's consummation required a filing with the Secretary of State).

43. The "single act" or specific jurisdiction subsections of § 3104(c), such as § 3104(c)(1), only allow jurisdiction over causes of action that are closely intertwined with the jurisdictional contact. DONALD J. WOLFE, JR. & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 3–5[a][1][iii] (2005); *accord* 10 *Del. C.* § 3104(c). When service is premised on these subsections, the Delaware-related conduct must form a source of the claim. *E.g., Arnold v. Soc'y for Sav. Bancorp., Inc.,* 1993 WL 526781, at *3 (Del.Ch.1993). Here, the tight nexus between the Certificate Amendment and the entrenchment scheme forming the cause of action make service under the single act provisions of the long-arm statute unproblematic.

ration that causes cognizable injury to the entity (as an unfair dilution is deemed to do) ... it is fair to say that the entity was injured in its chosen home—Delaware—the situs that reflects the center of gravity of the corporation for all issues involving its internal affairs. The balance sheet and voting dilution injuries that result in fiduciary duty cases are in some sense metaphysical, but that reality strengthens the argument that the corporation at the very least suffers these injuries in its chosen domicile. Any problems with this common sense approach are best policed by the minimum contacts tests or by the other aspects of § 3104, which for the most part require that an actual act take place in Delaware.[44]

Because Boeckman and Baker & Hostetler were the parties responsible for filing the Certificate Amendment, there is, as noted, no need to impute the conduct of the Top Managers to them by using the conspiracy theory. But the moving defendants make another odd argument that I must consider. That argument—improperly advanced for the first time in the moving defendants' reply brief—consists in the notion that because the Certificate Amendment was filed on behalf of Randall Bearings as a corporation, Boeckman and Baker & Hostetler cannot be held personally responsible for the filing, for purposes of a personal jurisdiction inquiry under the long-arm statute. That is, even though the moving directors in fact were the parties who prepared the Certificate Amendment, retained CSC to file it as registered agent, and transmitted the Amendment to CSC in Delaware for filing with the Secretary of State, the fact that the Certificate Amendment was filed on behalf of Randall Bearings immunizes the moving defendants.[45] In its broadest form, a form that

**44.** *Chandler v. Ciccoricco,* 2003 WL 21040185, at *11 n. 46 (Del.Ch.2003). This court noted in *Chandler v. Ciccoricco* that the mandate to construe § 3104(c) to the constitutional limits of Due Process should warrant treatment of Delaware as the situs of injury to a Delaware corporation. Id. As *Chandler* mentioned, the seminal conspiracy jurisdiction case in Delaware, *Istituto Bancario Italiano SpA v. Hunter Engineering Co., Inc.,* 449 A.2d 210, 228 (Del.1982), may seem at first blush to preclude a holding that the situs of injury to a Delaware corporation not headquartered in Delaware that is victimized by a breach of fiduciary duty is in Delaware for purposes of § 3104(c)(3). Chandler, 2003 WL 21040185, at *11 n. 46. Upon close examination, there is not as much tension between this conclusion and the Supreme Court's decision in *Istituto* as the Chandler decision perceived. In that case, an Italian holding company in financial difficulty pledged its entire 10,000 shares of a wholly-owned Delaware subsidiary to an Italian bank. *Istituto,* 449 A.2d at 214–15. When it appeared that the loan would not be repaid, the subsidiary's board authorized additional shares and distributed 190,000 shares as a stock dividend that was then transferred to another owner, thus diluting the security interest from 100% to 5% of the subsidiary's assets. *Id.* On those facts it appeared clear to the Supreme Court that the situs of the injury to the pledgee's security interest in a direct suit by the Italian bank was either the location of the pledge, or the home of the pledgee Italian bank. *Id.* at 228. In other words, *Istituto* did not involve a derivative claim. By contrast, when a Delaware resident—a Delaware corporation—is injured by a breach of fiduciary duty, it is easy to conceive of the corporation as having been injured in its chosen place of legal residence. After all, it is precisely for purposes of internal affairs that corporations—which are not physical beings—choose a legal domicile. When they suffer financial injury, that injury should, consistent with the instruction of *Hercules* and other Delaware public policies favoring a broad construction of § 3104's reach, be deemed to have been suffered in Delaware for purposes of § 3104(c)(3).

**45.** The defendants cite to cases which advance a fairness-based policy rationale for protecting corporate fiduciaries from being sued personally when jurisdiction over them is based solely on contacts initiated in their fiduciary capacity. *See Plummer & Co.*

the moving defendants did not shy from advancing, the moving defendants posit that the filing of a charter amendment or other key corporate instrument with the Secretary of State in Delaware may never form the basis for serving a party sued for aiding and abetting a breach of fiduciary duty in Delaware. Why? Because such documents are formally filed by the corporation itself and thus respect for the corporation's separate legal identity requires that the individuals who caused the corporation to make the filings cannot be held personally accountable for those filings for purposes of § 3104.

One can sleep soundly at night confident that rejection of this argument is not at odds with either logic or sound public policy. When a claim for breach of fiduciary duty is at issue, the underlying conduct almost always involves formal action of the corporation itself. After all, the very essence of a breach of corporate law fiducia-ry duty claim is the misuse of corporate control.[46] For example, an unfair squeeze out merger by a controlling stockholder quintessentially involves the corporation entering into a merger agreement allowing the controlling stockholder to purchase the corporation for an unfair price.[47] That is, claims of fiduciary duty ultimately rest on the proposition that a corporate fiduciary has caused the corporation to do something at odds with its own best interests, typically so that the fiduciary could secure an improper personal benefit.[48] Indeed, in fiduciary duty cases, the relief that is sought often involves enjoining or rescinding official corporate action. That is in fact the situation presented by this case, in which the plaintiff seeks rescission of the grant of the disputed shares to the Top Managers.

Although there are sound public policy reasons for limiting the ability of contract

Realtors v. Crisafi, 533 A.2d 1242, 1246 (Del.Super.1987) ("The underpinning of this fiduciary shield doctrine is the notion that it is unfair to force an individual to defend a suit brought against him personally in a forum with which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer.") (quoting Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 902 (2d Cir.1981)); Marketing Products Management, LLC v. HealthandBeautyDirect.com, Inc., 2004 WL 249581, at *3 (Del.Super.2004) (citing Plummer & Co. Realtors, 533 A.2d at 1246).

46. E.g., Guth v. Loft, Inc., 5 A.2d 503, 510 (Del.1939) ("Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests.").

47. E.g., Weinberger v. UOP, Inc., 457 A.2d 701 (Del.1983).

48. E.g., Zahn v. Transamerica Corp., 162 F.2d 36, 46 (3d Cir.1947) ("[T]he directors of Axton–Fisher ... were the instruments of [a controlling stockholder,] Transamerica[,] ... voting in favor of their special interest, that of Transamerica, [and they] could not and did not exercise an independent judgment in calling the Class A stock, but made the call for the purpose of profiting their true principal, Transamerica. In short a puppet-puppeteer relationship existed between the directors of Axton–Fisher and Transamerica. The act of the board of directors in calling the Class A stock, an act which could have been legally consummated by a disinterested board of directors, was here effected at the direction of the principal Class B stockholder in order to profit it."); Sinclair Oil Corp. v. Levien, 280 A.2d 717, 721 (Del.1971) ("Self-dealing occurs when the parent, by virtue of its domination of the subsidiary, causes the subsidiary to act in such a way that the parent receives something from the subsidiary to the exclusion of, and detriment to, the minority stockholders of the subsidiary."); Bennett v. Propp, 187 A.2d 405, 408 (Del.1962) (Chairman of the board caused a corporation to engage in unauthorized stock purchases in anticipation of a hostile tender offer. Share "purchases were made to preserve the control of the corporation in [the chairman] and his fellow directors.... The use of corporate funds for such a purpose is improper.").

**1060**

and tort claimants to file certain claims against corporate officers and directors for conduct of the corporation itself,[49] those reasons have little to do with this case or other cases involving the internal affairs of corporations. When well-pled facts support the inference that a person caused a corporation to take jurisdictionally-significant conduct in Delaware and that conduct is an element in a scheme by corporate fiduciaries to unfairly advantage themselves at the expense of a Delaware corporation and its stockholders, our case law has consistently held that the long-arm statute may be used to serve that person.[50] It would be surprising were it otherwise, because a contrary ruling would turn the very essence of faithless conduct—the abuse of corporate power—into an immunity from accountability, precisely because the disloyal fiduciaries derived their wrongful gains from actions of the corporation itself, albeit corporate actions that their own conduct brought about.[51] Such

an accountability-destroying reading of the long-arm statute would itself be entirely disloyal to the statute's purpose, as articulated by our Supreme Court in its *Hercules* decision.[52]

Boeckman and Baker & Hostetler assert a narrower version of the prior argument to protect them from application of the conspiracy theory of jurisdiction—that is, that the filing of the Certificate Amendment, although brought about by humans at Baker & Hostetler, was a corporate act of Randall Bearings, for which those humans may not be held responsible for purposes of a personal jurisdiction analysis under § 3104. This narrower version centers on considerations supposedly unique to the legal profession. According to the moving defendants, case law in some other jurisdictions says that lawyers cannot be sued simply for performing services for a client if all that the lawyers get out of

49. *See Allied Capital Corp. v. GC–Sun Holdings, L.P.*, 910 A.2d 1020, 1044 n. 63 (Del.Ch. 2006) ("When corporations commit intentional torts or breaches of contract, they obviously do so at the behest of some human agent and often more than one. Therefore, if corporate agents were generally capable of conspiring among themselves and with their corporate employer, many claims against corporations for their own acts could also regularly be supplemented by claims against corporate managers for conspiring with each other to cause the corporation to act illegally."); Martin H. Pritikin, *Toward Coherence in Civil Conspiracy Law: A Proposal to Abolish the Agent's Immunity Rule*, 84 NEB. L.REV. 1, 25 (2005) (explaining that because corporate principals can only act through their agents, agency relationships and breaches of contract by the corporate principal would be chilled if agents "were to absorb the cost of tort liability for inducing a breach of their principals' contracts—or, more accurately, if they internalized the risk of such liability ex ante").

50. *See, e.g., Benihana*, 2005 WL 583828, at *8; *In re General Motors (Hughes) S'holder*

*Litig.*, 2005 WL 1089021, at *22; *Gibralt*, 2001 WL 647837, at *6 (Del.Ch.2001).

51. This is not a novel observation. In *U.S. v. Montreal Trust Co.*, for example, a New York federal court asserted jurisdiction over a corporate officer of a publicly-owned Canadian company who had been diverting funds through New York agents. 358 F.2d 239, 243 (2d Cir.1966). The officer claimed that because his only contacts with New York were in an official corporate role on behalf of the Canadian company he was charged with victimizing, he was protected by the fiduciary shield doctrine. In rejecting his argument on appeal, the Court of Appeals for the Second Circuit stated: "It would be ironic, indeed, if the very corporations whose funds [the officer] is charged with diverting were to supply him with a shield against suit for tax liability allegedly incurred in connection with this purported breach of his fiduciary duty." *Id.; see also Marine Midland Bank*, 664 F.2d at 902 (2d Cir.1981) (summarizing *Montreal Trust*, 358 F.2d at 243).

52. 611 A.2d 476, 480–81 (Del.1992).

those services is a fee.[53] That is, if the only benefit of the lawyer's actions is getting a fee for the work he did, this doctrine supposedly gives the lawyer a free pass from being held civilly responsible for his actions to those who would sue their clients. The moving defendants refer to this doctrine as a version of the "intracorporate conspiracy doctrine" or the "agent's immunity rule," whereby corporate officials acting in their official capacity are usually deemed incapable of conspiring with the corporation.[54]

Again, the problem with the moving defendants' argument is that they seek to wrench notions that are logical in some contexts into a context in which they make no sense. For certain purposes—for example, claims of tort or antitrust violations

brought against a corporation and its officers—it makes little sense to describe the officers as conspiring with the corporation.[55] After all, corporations make decisions through humans, usually humans involved in collaborative activity. Indeed, if one assumes that every corporate action must involve some human actor, every corporate act could be a conspiracy between the corporation and the human causing its act.[56] This area of the law is complex and freighted with important policy questions regarding the circumstances in which both the corporation and those who cause it to act should be held accountable to third-parties and society for corporate conduct. Unsurprisingly, for example, there are distinctions in this area between civil and criminal responsibility and among various kinds of civil claims.[57]

53. *See, e.g., In re County of Orange,* 203 B.R. 983, 999–1000 (Bankr.C.D.Cal.1996), *rev'd on other grounds* ("The gain must be more than the fees received from the fiduciary-defendant that the nonfiduciary is accused of conspiring with."); *Cooper v. Equity Gen. Ins. Co.,* 219 Cal.App.3d 1252, 268 Cal.Rptr. 692, 696–97 (1990) (holding that an attorney working on a contingency basis did not have an independent financial stake because plaintiff did not allege that the attorney "stood to gain anything more than a fee for his work as an attorney."); *see also General Refractories Co. v. Fireman's Fund Ins. Co.,* 337 F.3d 297, 313 (3d Cir.2003) ("[T]he mere fact that attorneys have 'mixed motives' such as 'enhancing' their reputation by aggressive representation, does not remove their conduct from the scope of the agency.").

54. *See, e.g., Superior Court Chain Store Maint., Inc. v. Nat'l Glass & Gate Serv. Inc.,* 2004 WL 877599, at *11 (R.I.Super.2004) ("It is well-settled that 'a conspiracy between a corporation and its agents, acting within the scope of their employment, is a legal impossibility.' ... The policy behind the intracorporate conspiracy doctrine "is to preserve independent decision-making by business entities and their agents free of the pressure that can be generated by allegations of conspiracy.") (quoting *Marmott v. Maryland Lumber Co.,* 807 F.2d 1180, 1184 (4th Cir.1986) and *Fairley v. An-*

drews, 300 F.Supp.2d 660, 668 (N.D.Ill. 2004)); *see also Roth v. La Societe Anonyme Turbomeca France,* 120 S.W.3d 764, 778 (Mo. App.2003) ("Because an attorney is an alter ego of his or her client, a conspiracy between the attorney and the client is not possible.").

55. *See Allied Capital Corp.,* 910 A.2d at 1044 n. 63 (discussing the complexities of using the tort of civil conspiracy to apply to concerted action among corporate officials); *see also* Kathleen F. Brickey, *Conspiracy, Group Danger and the Corporate Defendant,* 52. U. Cin. L.Rev. 431, 432–33 (1983).

56. *See Allied Capital Corp.,* 910 A.2d at 1044 n. 63 ("[I]f corporate agents were generally capable of conspiring among themselves and with their corporate employer, many claims against corporations for their own acts could regularly be supplemented by claims against corporate managers for conspiring with each other to cause the corporation to act illegally.").

57. *See* Pritikin, *supra* note 49 at 4–5 ("[T]he single legal actor theory—the fiction that the agent's acts are those of the principal, and thus that the 'plurality' element of conspiracy is absent—arose where policy considerations regarding the underlying offense supported its application. The fiction is accepted in the

Here, however, those complications are not present. The alleged conspiracy does not include Randall Bearings; Randall Bearings is one of the alleged victims. The conspiracy is among the Top Managers, allegedly with the knowing assistance of Boeckman and Baker & Hostetler, who were being paid to represent Randall Bearings, not the Top Managers. The conspiracy was intended to entrench and enrich the Top Managers.

Given the nature of this conspiracy, the doctrine on which the moving defendants rely does not even apply on its own terms. Well-pled facts support the inference that the moving defendants were not acting within the appropriate scope of their agency. That is, there are well-pled allegations that the moving defendants were in fact acting to unfairly advantage the Top Managers at the expense of their real client, the company. As the moving defendants admit, when an agent is alleged to have breached its duty to its principal, the so-called agent's immunity they rely upon does not apply.[58] Furthermore, it is not the case, as the moving defendants allege, that the only benefit the moving defendants got was the fees they were paid for their work. By assisting in an entrenchment scheme, the moving defendants got a

benefit similar to that obtained by the Top Managers, securing their position as company counsel against the risk of displacement in a takeover. I perceive no Delaware public interest that would be served by adopting a rule that insulates advisors of managers of a Delaware corporation from accountability if can be proven that those advisors, although being paid by the corporation to advise the managers in their official capacity, consciously assisted the managers in breaching their fiduciary duties.

Put simply, the use of § 3104 to serve the moving defendants is entirely consistent with the language and evident purpose of that statute, and with the precedent interpreting it. The requirement that there be a statutory basis for service is therefore met.

The second step in the personal jurisdiction analysis is a simple one. The United States Supreme Court has held that it is constitutionally permissible to exercise personal jurisdiction over a non-resident defendant when that defendant should have "reasonably anticipated ... that his ... actions might result in the forum state exercising personal jurisdiction over him in order to adjudicate disputes arising from

antitrust context, on the rationale that proscribing certain intracorporate combinations that restrain trade could chill legitimate business conduct. However, the same fiction is rejected in the context of criminal conspiracy, on the rationale that the increased danger arising from a group of criminal actors that justifies punishing conspiracy generally exists even where the conspirators are all agents and employees of a single entity."); *see also* Brickey, *supra* note 55 at 438–40 ("The incongruity of these rules is attributable to the disparate policy considerations that shaped them.").

58. *E.g., Amaysing Techs. Corp v. CyberAir Commc'ns, Inc.,* 2005 WL 578972, at *7 (Del. Ch.2005) ("An exception exists to this general

rule, however, when the officer or agent of the corporation steps out of her role as an officer or agent and acts pursuant to personal motives.... Courts interpreting the 'personal reasons' exception ... have read it to mean a personal animus and/or desire for financial benefit other than one's corporate salary.") (internal citations and quotations omitted); Pritikin, *supra* note 49 at 25 (The agent's privilege is "based on the agent's value to the principal in accomplishing its legitimate business goals.... [I]f benefiting the principal is no longer the sole or primary purpose of the agent in inducing a breach, the social interest in the agent's inducement no longer outweighs the interest in upholding the contract, so the privilege is vitiated.").

those actions."[59] To satisfy this test, the defendant need not have ever entered the forum state physically because the Supreme Court has rightly focused the test on the more relevant question of whether the defendant has engaged in such conduct directed toward the forum state that makes it reasonably foreseeable that that conduct could give rise to claims against the defendant in the forum state's courts.[60]

■ That test is easily satisfied here. As noted previously, Baker & Hostetler advertises itself as a national, indeed, international, firm that regularly advises public corporations in matters of corporate and securities law. It touts its coast-to-coast platform.

As sophisticated practitioners of corporate law, the moving defendants realize

that Delaware, as a chartering state, has an important interest in regulating the internal affairs of its corporations, in order to ensure that the directors and officers of Delaware corporations honor their obligations to operate the corporation lawfully and in the best interest of the corporation's stockholders. The United States Supreme Court has long recognized the legitimacy and importance of a state's interest in regulating the internal affairs of its corporations.[61] It can also be no surprise to the moving defendants that this important interest is given life in our state by providing stockholders with access to Delaware's court system in order to assert claims of breach of fiduciary duty; after all, decisions too numerous to cite make this clear.[62] So too does § 3114 of Title 10, which makes clear that the directors

**59.** *In re USACafes, L.P. Litig.,* 600 A.2d 43, 50 (Del.Ch.1991) (citing *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).

**60.** *E.g., Asahi Metal Indus. Co. Ltd. v. California,* 480 U.S. 102, 110, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987); *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *see also* William M. Richman, *Understanding Personal Jurisdiction,* 25 Ariz. St. L.J. 599, 617–18 (1993) ("The Court has realized that 'it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communication across state lines, thus obviating the need for physical presence.' *Burger King,* 471 U.S. at 476, 105 S.Ct. 2174. It is enough if defendant's conduct is 'purposefully directed' at the forum. *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984).... Also, defendant may be amenable when her actions outside the state have foreseeable effects inside the state. Indeed, if the defendant's out-of-state activity is purposeful and geographically targeted at the forum state, jurisdiction can be based on a single transaction or occurrence—the most minimal of contacts. *McGee v. Int'l Life Ins. Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957).").

**61.** *E.g., CTS Corp. v. Dynamics Corp. of America,* 481 U.S. 69, 91, 93, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987) (recognizing that "[a] State has an interest in promoting stable relationships among parties involved in the corporations it charters" and "a substantial interest in preventing the corporate form from becoming a shield for unfair business dealing."); *cf. Edgar v. MITE Corp.,* 457 U.S. 624, 645–46, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982) (observing that no state has a legitimate interest "in regulating the internal affairs of foreign corporations").

**62.** *E.g., Sternberg v. O'Neil,* 550 A.2d 1105, 1125 (Del.1988) ("The Delaware courts and legislature have long recognized a 'need for consistency and certainty in the interpretation and application of Delaware corporation law and the desirability of providing a definite forum in which shareholders can challenge the actions of corporate management without having to overcome certain procedural barriers which can be particularly onerous in the context of derivative litigation.'") (quoting *Armstrong v. Pomerance,* 423 A.2d 174, 178 (Del.1980)); *In re Topps Co. S'holders Litig.,* 924 A.2d 951, 960 (Del.Ch.2007) ("[I]n Delaware's system of corporate law, the adjudication of cases involving the fiduciary duties of directors in new business dynamics is one of the most important methods of regulating the internal affairs of corporations, as these cases

and officers of Delaware corporations, accept, as a condition of office, the responsibility for answering official capacity suits in the court of this State.[63] Therefore, the moving defendants had to know that if the Top Managers and other defendant-directors engaged in conduct that gave rise to fiduciary duty claims, that the Top Managers and other defendant-directors were likely to be sued in Delaware.[64]

Given these realities, it is difficult to conceive how it would shock the conscience to require the moving defendants to defend a lawsuit in Delaware. As is clear, the moving defendants purported to provide a wide range of advice and services to the board and officers of a Delaware corporation about important issues of Delaware law.[65] That advice and assistance included the conception, preparation, and

articulate the equitable boundaries that cabin directors' exercise of their capacious statutory authority."); *Ryan v. Gifford,* 918 A.2d 341, 349–50 (Del.Ch.2007) (Delaware has a "significant and substantial interest in overseeing the conduct of those owing fiduciary duties to shareholders of Delaware corporations.") (quoting *In re Chambers Dev. Co. S'holders Litig.,* 1993 WL 179335, at *8 (Del.Ch.1993)); *see also Diedenhofen–Lennartz v. Diedenhofen,* 931 A.2d 439, 451 n. 26 (Del.Ch.2007) (citing numerous cases evidencing Delaware's "compelling interest in the efficient and consistent application of its laws governing business entities").

**63.** *HMG/Courtland Properties, Inc. v. Gray* explains why Delaware's director consent statute is constitutionally valid:

[T]he power of defendant directors to act in their director capacity arises exclusively under the Delaware corporation laws; defendant directors avail themselves of important privileges and legal powers and protections when they accept office as directors of Delaware corporations; by virtue of § 3114, defendant directors who accept such privileges are put on notice that they can be haled into court here to answer for breaches of Delaware corporation laws; Delaware has a legitimate interest in enforcing those laws; § 3114 is narrowly tailored to serve that legitimate interest and to compel the appearance of defendant directors only where that purpose is served; that the state's legitimate interest outweighs any burden to defendant directors; and, as a result, defendant directors served in conformity with § 3114 can fairly be expected to defend suits here.

729 A.2d 300, 304 n. 3 (Del.Ch.1999) (summarizing *Armstrong v. Pomerance,* 423 A.2d 174 (Del.1980)).

**64.** *See HealthTrio, Inc. v. Margules,* 2007 WL 544156, at *6 (Del.Super.2007) (finding that a non-Delaware attorney's provision of legal services for a client in filing its certificate of incorporation in Delaware and in acting for it in connection with a prior Delaware litigation, including calls and letters to corresponding counsel in Delaware, satisfied the long-arm statute and the Due Process Clause when the lawyer was sued in Delaware for malpractice relating to the prior Delaware litigation even though the attorney never appeared in the prior Delaware litigation or physically entered Delaware).

**65.** In fact, during the period when the Certificate Amendment and the Equity Incentive Plan were being devised and implemented, Boeckman was representing Randall Bearings in connection with a books and records request made by the lead plaintiff in this action, Gary Sample. *See* Naylor Supp. Aff. Exs. 9, 10, 11, 12, 13, 14. In the § 220 litigation, Boeckman appeared on pleadings and a response to interrogatories filed in this court as of counsel and took the lead in jousting with Sample's Delaware-based counsel over the books and records that the company would produce to Sample. *See* Answer, *Sample v. Randall Bearings, Inc.,* C.A. 491–N; Defendant Randall Bearing, Inc.'s Responses to Plaintiff's First Set of Interrogatories, *Sample v. Randall Bearings, Inc.,* C.A. 491–N; Naylor Aff. Exs. 25, 26, 28, 30. In the course of that jousting, Baker & Hostetler also gave its view on the propriety and scope of Sample's right to books and records under Delaware law. *See* Naylor Aff. Exs. 25, 26, 28. Notably, in a memorandum that Boeckman wrote to Top Manager and Randall Bearings CEO Kent Morgan relating to the grants issued under the Equity Incentive Plan, Boeckman reminded Morgan that there are "stockholders like Gary Sample out there." Naylor Aff. Ex. 7.

filing of the Certificate Amendment, which culminated in a filing in Delaware. Indeed, it is difficult to find a part of the scheme attacked by the plaintiff that did not involve substantial participation by the moving defendants.

For sophisticated counsel to argue that they did not realize that acting as the de facto outside general counsel to a Delaware corporation and regularly providing advice about Delaware law about matters important to that corporation and its stockholders might expose it to this court's jurisdiction fails the straight-face test. The moving defendants knew that the propriety of the corporate action taken in reliance upon its advice and through its services would be determined under Delaware corporate law, and likely in a Delaware court.

As a more general matter, the moving defendants are poorly positioned to claim a violation of Due Process. Given its own self-proclaimed national reach, Baker & Hostetler is in a graceless position to claim to be constitutionally aggrieved by an exercise of jurisdiction by this court over it in a case where the claims against it entirely rest on its actions in providing Delaware law advice to a Delaware corporation. That is especially so when Baker & Hostetler has taken the role of quarterbacking the defense of this action by drafting pleadings and briefs filed by other lawyers with this court, directing the defendants' (inadequate, incomplete, and untimely) responses to discovery, and even drafting the briefs in support of this motion.

Lastly, I reject the idea that denying the moving defendants' motion somehow will undermine the public policy of this state, by causing law firms that provide advice to Delaware corporations to fear that they will be regularly hauled into court here. This is a highly unusual case. In most fiduciary duty cases, it will be exceedingly difficult for plaintiffs to state an aiding and abetting claim against corporate counsel. But in this case, the moving defendants have conceded—as frankly the record makes clear they must—the pleading-stage viability of the claims against them.

More importantly, Delaware has no public policy interest in shielding corporate advisors from responsibility for consciously assisting the managers of Delaware corporations in breaching their fiduciary duties. If well-pled facts can be pled that support the inference that a corporate advisor knowingly assisted corporate directors in breaching their fiduciary duties, Delaware has a public policy interest in ensuring that its courts are available to derivative plaintiffs who wish to hold that advisor accountable to the corporation. The precise circumstances when corporate advisors should be deemed responsible to the corporation or its stockholders for their role in advising directors and officers should be determined by decisions addressing the merits of aiding and abetting claims, not by decisions about motions to dismiss for lack of personal jurisdiction. Lawyers and law firms, like other defendants, can be sued in this state if there is a statutory and constitutional foundation for doing so.

## VII. *Conclusion*

Both the statutory and constitutional bases for jurisdiction over defendants Boeckman and Baker & Hostetler are obvious. Their motion to dismiss is denied. IT IS SO ORDERED.