# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LILLY LEA PERRY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2017-0290-VCL |
| | ) | |
| DIETER WALTER NEUPERT and CÔTE D'AZUR ESTATE CORPORATION, | ) ) | |
| | ) | |
| Defendants. | ) | |
| ------------------------------------------------------- | ) | |
| CÔTE D'AZUR ESTATE CORPORATION, | ) ) | |
| | ) | |
| Counterclaim Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LILLY LEA PERRY, | ) | |
| | ) | |
| Counterclaim Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: November 29, 2017
Date Decided: December 6, 2017

Jeremy D. Anderson, FISH & RICHARDSON P.C., Wilmington, Delaware; *Attorney for Lilly Lea Perry.*

Douglas D. Hermann, James H. S. Levine, PEPPER HAMILTON LLP; *Attorneys for Dieter Walter Neupert and Côte d'Azur Estate Corporation.*

**LASTER, V.C.**

The parties dispute who owns the equity of defendant Côte D'Azur Estate Corporation (the "Company"). The parties also dispute whether defendant Dieter Walter Neupert had authority to convert the Company from a limited liability company to a corporation, as he did by causing the filing of a certificate of conversion with the Delaware Secretary of State on June 30, 2016.

Plaintiff Lilly Lea Perry contends that her husband, Israel Igo Perry, owned all of the Company's equity when he died in 2015, such that she now owns all of its equity as his sole heir. She claims that Neupert lacked authority to convert the Company into a corporation. The Company and Neupert contend that, in 2013, before he died, Israel[1] transferred all of the equity to a private Liechtenstein foundation (the "Foundation"), which still owns it today.[2] They claim that the Foundation executed an unlimited power of attorney in favor of Neupert, which gave him the requisite authority to file the certificate of conversion.

Lilly has moved to join the Foundation as an involuntary counterclaim plaintiff pursuant to Court of Chancery Rule 19. This decision holds that the Foundation is a party which should be joined for a just resolution of the dispute. Nevertheless, because it

---

[1] To avoid confusion, this decision uses first names to refer to members of the Perry family. Some of the documents that the parties have submitted refer to Lilly as "LLP" and Israel as "IIP."

[2] The defendants aver that when Israel transferred his equity in the Company to the Foundation, it was named the Ludwig-Polzer-Hoditz Foundation. It later changed its name to the BGO Foundation. The name change does not matter for purposes of this decision.

1

appears that the Foundation can be served under the Delaware Long-Arm Statute, it is not

necessary, at this stage, for the court to consider adding the Foundation as an involuntary

counterclaim plaintiff.[3] Lilly shall add the Foundation to the case as an additional relief

---

[3] This decision expresses no opinion about whether the "now atrophied process" of sequestration might be available in this case. *Cable Advert. Networks, Inc. v. DeWoody*, 632 A.2d 1383, 1386-87 (Del. Ch. 1997). The sequestration statute and the related procedure for foreign attachment permit a court to attach Delaware-sitused property to compel a nonresident's appearance. *See* 10 *Del. C.* §§ 365-66. The United States Supreme Court held that sequestering nonresident directors' stock as a means of asserting jurisdiction for *in personam* proceedings for breaches of fiduciary duty violated due process. *Shaffer v. Heitner*, 433 U.S. 16 (1977). Since *Shaffer*, some Delaware authorities have indicated that the Delaware situs of corporate stock, either standing alone or in conjunction with other contacts, could be sufficient to support jurisdiction in disputes over the legal existence, rights, characteristics, or attributes of the shares, or even potentially the ownership of the shares. *See Onescreen Inc. v. Hudgens*, 2010 WL 122937, *4-6 (Del. Ch. Mar. 30, 2010) (collecting cases). In *Onescreen*, Vice Chancellor Parsons considered these authorities and held that a corporation could not rely on the Delaware situs of its shares to support jurisdiction in a suit to rescind transfers of preferred stock from its former CEO to other individuals where the transferees lacked other contacts with the State of Delaware. *Id.* at *6.

This case is arguably distinguishable in at least two respects. First, the Foundation is said to have acquired ownership of 100% of the equity of a Delaware corporation, which has been held to constitute a significant (albeit not automatically dispositive) contact with this jurisdiction. *See Sternberg v. O'Neill*, 550 A.2d 1105, 1119-22 (Del. 1988) (finding that minimum contacts existed for purposes of a double-derivative action where non-Delaware entity both acquired sole ownership of a Delaware subsidiary and subsequently operated the subsidiary as a Delaware entity for more than thirty years). Second, the Foundation is a foreign entity that the defendants claim made a cross-border acquisition of shares. In his concurring opinion in *Shaffer*, Justice Stevens indicated that a cross-border purchase of shares might be sufficient to cause the purchaser to be subject to jurisdiction in the courts of the domiciliary state for traditional *in rem* matters. *Shaffer*, 433 U.S. at 218 (observing that "[i]f I visit another State, or acquire real estate or open a bank account in it, I knowingly assume some risk that the State will exercise its power over my property or my person while there" and positing that "[p]erhaps the same consequences should flow from the purchase of stock of a corporation organized under the laws of a foreign nation, because to some limited extent one's property and affairs

defendant by serving it with process under the Long-Arm Statute. Once served, the Foundation may raise any defenses that it believes it possesses. In addition, if Lilly wishes to seek to have the Foundation realigned as a counterclaim plaintiff, she may file a suitable motion.

At this point, the court need not reach the question of whether to add the Foundation as an involuntary plaintiff under the last sentence of Rule 19(a). The relevant language only permits the court to add an absent party as an involuntary plaintiff "in a proper case," which is a term of art under the rule.[4] Determining that a proceeding is "a proper case" carries significance, because "[i]t is generally agreed that [the involuntary plaintiff provision of Rule 19(a)], derived from *Independent Wireless Tel. Co. v. Radio Corp. of Am.*, 269 U.S. 59 (1926), permits involuntary joinder as a plaintiff of a party over whom there is otherwise no personal jurisdiction, and further means that the party so

---

then become subject to the laws of the nation of domicile of the corporation" and that "because a foreign investment is sufficiently unusual to make it appropriate to require the investor to study the ramifications of his decision"); *see also Papendick v. Bosch*, 419 A.2d 147, 153-54 (Del. 1979) (noting potential relevance of defendant's status as a foreign entity but declining to address the question where another jurisdictional avenue existed).

[4] Ch. Ct. R. 19(a). *See generally* 7 Charles Alan Wright et al., *Federal Practice and Procedure* § 1605 (3d ed. 2001) [hereinafter *Federal Practice*]; Jean F. Rydstrom, Annotation, *What Constitutes "Proper Case" Within Meaning of Provision of Rule 19(a) of Federal Rules of Civil Procedure That When Person Who Should Join as Plaintiff Refuses to Do So, He May Be Made Involuntary Plaintiff "In a Proper Case*," 20 A.L.R. Fed. 193 (1974 & Supp.).

joined will be bound by res judicata."[5] If the Foundation, after being served, refuses to appear and successfully contests jurisdiction, then the question of adding the Foundation as an involuntary plaintiff under Rule 19(a) will become ripe.

## I.   FACTUAL BACKGROUND

The facts are drawn from the pleadings, the documents that the pleadings incorporate by reference, and the documents that the parties submitted in connection with the Rule 19 motion. This is a procedural decision, and the court has not yet conducted an evidentiary hearing. The descriptions of the factual background in this decision therefore does not represent a set of factual findings, but rather how the record appears at this preliminary stage.

## A.   Lilly's Claim To Own All Of The Company's Equity

Israel died on March 18, 2015.[6] Lilly is Israel's surviving spouse.[7] At the time of his death, he was a non-domiciled resident of the United Kingdom, where proceedings

---

[5] June F. Entman, *Compulsory Joinder of Compensating Insurers: Federal Rule of Civil Procedure 19 and the Role of Substantive Law*, 45 Case W. Res. L. Rev. 1, 27 n.108 (1994); *accord* Rydstrom*, supra*, § 2 (explaining that, when the "proper case" requirement is met, "the absentee may be named a plaintiff against his will, and he will be bound by any judgment rendered on principles of res judicata").

[6] Answer ¶¶ 1, 12 (admitting this fact).

[7] *See* Answer ¶ 1 (admitting Lilly's status as surviving spouse).

involving his estate are pending.[8] Lilly contends that she is the sole beneficiary of Israel's estate.[9]

---

[8] *See* Compl. ¶ 1. In this litigation, the defendants made the following representation to the court about Israel's estate planning: "During his lifetime, to benefit his family members, Israel carefully crafted an estate plan, using multiple entities to hold his wealth, while retaining few assets as his personal property." Resp. ¶ 11. In an affidavit filed in the probate proceeding, Neupert provided a different description of the level of planning and the resulting degree of certainty that characterized Israel's estate:

> So far as [Israel's] worldwide estate is concerned, I am not at this stage able to give even an approximate assessment of its value. Many of the assets to which the Testator was beneficially entitled were held under trusts or through nominee entities or persons. Furthermore, as I have already mentioned, [Israel] tended to conduct his affairs informally, and often through undocumented oral arrangements. He frequently disposed of interests in assets during his lifetime while appearing to retain absolute use of them. This means that it is necessary to assess the ownership very carefully in each case and I have been working to collect the evidence in order to take the necessary advice in the relevant jurisdictions. Whether or not they will be technically regarded as forming part of his estate in the jurisdiction in which they are located will depend partly on the details of the arrangements, and partly on the relevant local law.

Resp. Ex. 3 ¶ 37. The tension between these depictions foreshadows a pattern of inconsistent statements by the defendants.

[9] *See* Compl. ¶ 2. In this litigation, the defendants have represented to the court that Lilly's contention "is not accurate" because Lilly and Israel had two daughters and four grandchildren, who are also his heirs. Resp. ¶ 9 n.2. In email correspondence, by contrast, Neupert referred to Lilly as Israel's sole heir. *See* Reply Ex. 4 (describing Lilly as "the only heir to the UK assets"); Reply Ex. 7, at 1 (describing Lilly as "the sole heir to the LLC shares"); Reply Ex. 8, at 1 (describing Lilly as "sole heir" under Israel's will). In his affidavit in the probate proceeding, Neupert likewise stated that "the only beneficiary under the English Will is the Testator's widow." Resp. Ex. 3 ¶ 94.

The parties agree that, during his lifetime, Israel accumulated significant wealth. One of his assets was a villa in the south of France called La Treille (the "Villa").[10] Lilly values the property at approximately €25 million.[11]

To hold title to the Villa, Israel caused the Company to be formed on May 1, 2001.[12] It was a single-member Delaware limited liability company, and Israel served as the sole member of the LLC.[13] Lilly contends that, until the events giving rise to this litigation, she believed that this state of affairs had persisted until Israel's death. In other words, when Israel died, the Company was still an LLC, and Israel was still the sole member of the Company. The operating agreement for the Company did not provide for it to dissolve upon the death of its sole member.[14] Consequently, upon his death, Israel's membership interest in the Company became an asset of his estate.

---

[10] *See* Compl. ¶ 1; *accord* Resp. ¶ 17 ("Israel formed Côte d'Azur to own a villa in the South of France.")

[11] Compl. ¶ 1. Neupert appears to have obtained an estimate that placed the market value of the Villa at €12-15 million. *See* Resp. Ex. 9.

[12] Compl. ¶ 10 & Ex. C. In its counterclaim, the Company contends that Israel formed the LLC on April 17, 2001. Countercl. ¶ 3. Lilly admits this fact. Countercl. Answer ¶ 3. The certificate of formation reflects that it was filed on May 1, 2001, making that the date of formation for purposes of Delaware law. *See* 6 *Del. C.* § 18-2019(b) ("A limited liability company is formed at the time of the filing of the initial certificate of formation in the office of the Secretary of State or at any later date or time specified in the certificate of formation . . . .").

[13] Compl. ¶ 11.

[14] *See* Compl. ¶¶ 19-21; 6 *Del. C.* § 18-801(b).

Lilly contends that, as Israel's sole heir, she became the sole owner of the membership interest. In this litigation, the defendants have rejected Lilly's contention as "inexplicable" and "confusing at best."[15] Yet, in email correspondence, Neupert embraced precisely this theory when he authorized a French attorney to represent to the French taxation authorities that Lilly immediately gained title to the Company's equity upon Israel's death.[16] The apparent source of the defendants' current confusion is that the shares initially became the property of Israel's estate and, because the estate remains in probate, Lilly has not yet received title. Moreover, her claim is junior to any debts owed by the estate.[17] To my mind, Lilly's resulting claim is neither inexplicable nor confusing. At best, she is taking the same position that Neupert did. At worst, she is claiming an equitable interest as Israel's heir.

---

[15] Resp. ¶ 31 (describing Lilly's claim as "based on an inexplicable theory that, because she is Israel's surviving spouse and self-proclaimed sole beneficiary, the membership interest transferred to her automatically upon [Israel's] death."); Tr. at 9 (defense counsel criticizing Lilly's theory that she could inherit the equity in the Company as "a confusing theory of ownership").

[16] Reply Ex. 7, at 1 ("As I told you that according to the Last Will of Mr. Perry, his widow, Mrs. Lilly Perry, is the sole heir to the LLC shares, so automatically upon the death she becomes the new owner (without any further legal action).").

[17] According to Neupert's affidavit in the probate proceeding, the estate faces significant debts and could be insolvent. *See* Resp. Ex. 3 ¶¶ 26-35, 50-55. If Neupert is correct about the estate's liabilities, and if Lilly is correct that Israel owned the sole membership interest in the Company at the time of his death, then this litigation could result in a determination that would make the Company's equity available to the estate's creditors.

## B. Lilly's Dispute With Neupert

Neupert was one of Israel's long-time business associates.[18] He is a Swiss attorney and is the senior partner at Neupert Vuille Partners, a law firm based in Zurich, Switzerland.[19] In an affidavit dated February 23, 2017, which Neupert filed in the probate proceedings and which the defendants submitted here, Neupert described himself as "an advocate specializing in aviation, banking, tax and cross-jurisdictional corporate law in Switzerland."[20]

Lilly alleges that, shortly after Israel's death, Neupert approached her about a plan to rent out the Villa. She alleges that Neupert provided her with a written consent that would have appointed Neupert as a manager of the Company so that he could carry out the plan.[21] The record contains an email from Neupert attaching a written consent by which Lilly, as sole member of the Company, would appoint Neupert as a manager.[22]

Lilly did not sign the consent. Lilly contends that, after she refused, Neupert embarked on a scheme to take control of the Company. To accomplish this, on June 30, 2016, Neupert caused a certificate of conversion to be filed with the Delaware Secretary

---

[18] Answer ¶ 3 (admitting this fact).

[19] Answer ¶ 7 (admitting this fact).

[20] Resp. Ex. 3 ¶ 1.

[21] *See* Compl. ¶ 14.

[22] Reply Ex. 11, at 2.

of State that converted the Company from an LLC into a corporation.[23] The certificate listed Neupert as the President of the Company.[24] Neupert also caused a new certificate of incorporation to be filed for the Company that authorized the issuance of up to 10,000 shares of common stock.[25]

Lilly alleges that, after converting the Company into a corporation and taking control of it by purporting to be its President, Neupert registered the Company in France as a leasing company, consistent with his original scheme to rent out the Villa.[26] Lilly found out about Neupert's actions after her tax lawyers called and asked why she had registered the Company in France, given the tax liabilities that action would trigger.[27]

Lilly contends that Neupert had no authority to file the certificate of conversion and that, under the Company's operating agreement, only the sole member could act on behalf of the Company.[28] Lilly contends that Neupert had no authority to act on behalf of Israel's estate.[29] Although Israel had named Neupert as the executor of his estate, Lilly

---

[23] *See* Compl. ¶ 15 & Ex. C, at 2.

[24] *See* Compl. Ex. C, at 2. The defendants admit that the certificates were filed, but they point out that a corporate service company performed the filing. *See* Answer ¶ 8.

[25] *See* Compl. Ex. C.

[26] *See* Compl. ¶ 22.

[27] *See* Compl. ¶ 23.

[28] *See* Compl. ¶¶ 17-18 & Ex. A ¶ 10.

[29] *See* Compl. ¶ 21.

9

challenged his appointment in the probate proceedings. To date, Neupert has never been appointed to that role.[30]

Lilly promptly filed suit in this court. Her complaint contains five counts:

- Count I asserts a claim for fraud against Neupert.

- Count II asserts a claim against Neupert for violations of the Delaware Uniform Deceptive Trade Practices Act.

- Count III asserts a claim against Neupert for tortious interference with Lilly's rights under the Company's operating agreement.

- Count IV asserts a claim against Neupert for conversion.

- Count V asserts a claim against Neupert for unjust enrichment.

Lilly named the Company as a defendant so that the court could grant her the relief she seeks, including an order invalidating the conversion of the Company from an LLC into a corporation.[31]

## C.     The Defendants' Contentions

Neupert answered the Complaint and raised affirmative defenses. In his only non-conclusory affirmative defense, he asserts that "[t]he Complaint fails, in whole or in part, because Plaintiff was not a member of [the Company], is not a stockholder of [the Company], and lacks standing to bring her claims."[32]

---

[30] Answer ¶ 7 (admitting this fact). In emails, Neupert nevertheless described himself as the executor of the estate and purported to make representations and offered to sign declarations in that capacity. *See*, *e.g.*, Reply Exs. 2, 6, 7, 10.

[31] Compl. at 12.

[32] Answer at 17.

10

The Company joined in Neupert's answer to the Complaint and his affirmative defenses. The Company also asserted a counterclaim seeking a declaration that Lilly was neither a member of the Company nor a stockholder post-conversion.[33] The counterclaim alleges that, on May 1, 2013, before his death and while the Company remained an LLC, Israel assigned the sole member interest in the Company to the Foundation.[34] The Company alleges that, by operation of law, the Foundation became a member of the Company through the assignment.[35]

To evidence the transfer, both the Company and Neupert rely on a single-page document, titled "Deed of Assignment," ostensibly dated May 1, 2013. The document has a signature line for Israel and a signature line for an individual named Dieter Naeff to sign on behalf of the Foundation. Illegible signatures appear above the lines. Neither signature is notarized or attested in any way.

In its entirety, the Deed of Assignment states:

The Undersigned, Israel I. Perry, born 23 April 1942, Israeli Passport No. 10922443 herewith assigns the entire share capital of the following companies

1.    Greetnwin.com Inc, Delaware/USA
2.    Solid Virgin Islands Ltd, BVI

---

[33] Based on defense counsel's answers to the court's questions during oral argument on the Rule 19 motion, it appears that Neupert was the sole director of the Company when Lilly commenced this litigation. Counsel represented that Neupert added a second director sometime in September 2017, after Lilly filed suit. *See* Tr. at 16-17.

[34] Countercl. ¶ 4.

[35] *See* Countercl. ¶ 5; 6 *Del. C.* § 18-704(a)(3).

11

3.	Cote d'Azur Estate LLC, Delaware/USA
4.	The Heritage Collection

as well as

> all of the pieces of art listed in the ARTLID List (pending approval by SOCA of the items contained in their Chattel List)

to the [Foundation]

a foundation according to Liechtenstein Law

The assignee herewith accepts the aforementioned assignments.[36]

Neupert averred in the probate proceedings that the Deed of Assignment validly transferred the sole member interest of the Company to the Foundation as of May 1, 2013.[37]

## D.	The Current Dispute

Lilly filed an answer to the counterclaim in which she denied the validity of the Deed of Assignment. In addition to other affirmative defenses, she asserted that the counterclaim should be dismissed for failure to join a necessary party. On August 31, 2017, Lilly moved, pursuant to Rule 19, to join the Foundation as an involuntary counterclaim plaintiff or, in the alternative, to dismiss the Company's counterclaim and affirmative defenses for failure to join a necessary party.

---

[36] Answer Ex. A.

[37] Resp. ¶ 20 ("Dieter unequivocally averred that Israel had assigned his Côte d'Azur interest to the Foundation in 2013."); *accord* Resp. Ex. 3 ¶ 61.

**E. Evidence Of Fraud**

Both sides submitted documents in support of their positions on the Rule 19 motion. Of particular importance, Lilly submitted what appear to be emails from Neupert and representatives of the Foundation that directly contradict the positions that Neupert and the Company have taken before this court.

To recapitulate, Neupert and the Company have asserted that the following facts are true:

- The Foundation has been the only owner of the equity of the Company since May 1, 2013.[38]

- Because the Foundation had been the owner of the equity of the Company since May 1, 2013, it was impossible to the point of "inexplicable" that Lilly could inherit the equity of the Company under Israel's will.[39]

- Because of the transfer, Lilly cannot prove that she has any ownership interest in the Company, whether direct or indirect, beneficial or otherwise, except to the extent that Lilly is one of the beneficiaries of the Foundation itself.[40]

Contrary to the defendants' assertions, the record at this preliminary stage indicates that, until disputes arose, Neupert, the Company, and representatives of the Foundation (i) described the Deed of Assignment as unsigned and ineffective, (ii) maintained that Israel

---

[38] Resp. ¶ 18 ("As a result, beginning May 1, 2013, the Foundation has been the only owner of Côte d'Azur.").

[39] Resp. ¶ 31 (describing Lilly's claim as "based on an inexplicable theory that, because she is Israel's surviving spouse and self-proclaimed sole beneficiary, the membership interest transferred to her automatically upon [Israel's] death").

[40] *See* Resp. ¶ 5 (asserting that Lilly cannot prove that she has any ownership interest in the Company); *see also id.* ¶ 13 (describing Lilly as one of the beneficiaries of the Foundation).

13

was the sole owner of the equity in the Company until his death, (iii) recognized that Lilly stood to inherit the equity as Israel's heir, and (iv) treated Lilly as the sole member of the Company.

My impression, at this preliminary stage, is that the Foundation is an estate planning vehicle that Israel and Neupert established with the assistance of Lopag Trust ("Lopag"). In his affidavit in the probate proceeding, Neupert described Lopag as follows:

> Lopag is a commercial trust company set up in 1989 and registered on the Liechtenstein commercial register. I was one of the founding members of Lopag and was until 18 November 2016 a member of its Board of Trustees. At one time I also had a small shareholding in the company, but I disposed of that interest at the same time as retiring from the Board, so as to avoid any accusation of impropriety . . . .[41]

Although the record on this point remains incomplete, a document that the defendants submitted from 2013 identifies the three members of the governing board of the Foundation as Dominick Naeff, Markus Giger, and Louis Oehri.[42] Naeff and Oehri appear to be principals of Lopag. [43] As noted, Naeff purported to sign the Deed of Assignment on behalf of the Foundation.[44]

---

[41] Resp. Ex. 3 ¶ 43.

[42] *See* Resp. Ex. 2, at 2 (listing Naeff, Giger, and Oehri as members of the board of the Foundation as of June 12, 2013). Some documents spell Naeff's name as "Näff." For consistency, this decision uses Naeff.

[43] *See* Tr. at 18-19; *see also* Lopag, www.lopag.li/en/ (last visited Dec. 3, 2017) (identifying principals of firm).

[44] *See* Answer Ex. A.

14

The emails that Lilly has submitted indicate that, after Israel's death, Naeff did not view the Deed of Assignment as effective, nor did he think the Foundation owned any equity in the Company. In an email dated March 27, 2015, sent two weeks after Israel's death, a lawyer for Tamar Perry, Lilly's and Israel's daughter, asked Naeff about the Deed of Assignment, copying Neupert.[45] The subject of the email is direct and to the point: "[H]erewith is an assignment of Cote d Azure and Greetnwin – pls check."[46] Naeff emailed back the next day, copying Neupert and stating:

> This assignment is known to us, but it was never executed as far as we are aware. And I'm glad about it with respect to Cote d Azure since reporting obligations in France (relevant due to the Villa in France) became very strict in the meantime and we have to plan the transfer into THE LIZA TRUST carefully now. Who can inform us about the actual shareholders/directors of Cote d Azure?[47]

This email indicates that, as of March 2015, two weeks after Israel's death, the Foundation representative who purportedly executed the Deed of Assignment did not think it was valid or that the Foundation owned any equity in the Company.

Later that year, in December 2015, Naeff reiterated his belief about the ownership of the Company in an email exchange with Tamar. He again copied Neupert.[48] The

---

[45] The sender appears to be Israel Wolnerman, whom Neupert describes in his affidavit as "Tamar's Israeli layer [sic]." Resp. Ex. 3 ¶ 92.

[46] Reply Ex. 1.

[47] *Id.* Naeff also copied Ann Naeff-Oehri, who appears to be another principal of Lopag.

[48] Reply Ex. 5, at 1. He also copied Naeff-Oehri, Omri Yadlin, and Neil Duggan. Yadlin appears to be one of the trustees of various trusts that Israel created. Duggan

exchange concerned operational details of the Villa, including replacing employees there. Naeff made clear that the action had to be authorized by Israel's estate, because the estate owned the equity in the Company: "La Treille is held by Cote d'Azur Real Estate and [as] such part of the estate. We are neither shareholders nor directors, so we can only act based on goodwill of the involved."[49] As Naeff apparently saw it, the Foundation did not own the equity of the Company; it was part of Israel's estate. If the Deed of Assignment had been valid and the Foundation had owned all of the Company's equity since 2013, then Naeff's response could not have been true.

The emails that Lilly has submitted also indicate that, after Israel's death, Neupert did not view the Deed of Assignment as effective, nor did he think the Foundation owned the equity of the Company. Rather, he thought that Israel owned the equity when he died and that it was part of the estate, which was subject to probate in the United Kingdom. In an email dated August 12, 2015, sent three months after Israel's death, an individual named Danny Cohen contacted Neupert and Naeff regarding a question Lilly had asked about "payments for safekeeping of the villa."[50] Neupert responded, copying Naeff and Tamar:

---

appears to be a member of the governing board of the Swiss Protector Association, an entity which Neupert founded and which serves as the protector of at least one of the trusts that Israel created. *See* Resp. Ex. 3 ¶¶ 24, 32, 42-46. Lopag serves as the trustee for each of the trusts. *Id.* ¶ 43.

[49] Reply Ex. 5, at 1.

[50] Reply Ex. 2.

16

Thanks Danny – while approving the contents of your mail we should not forget that formally all agreements concerning the Villa should be concluded by the owner, ie. Cote d'Azur Real Estate LLC, Delaware

How far are we with retrieving the company documents and who should contact the French Tax Advisers concerning the disclosure of the new beneficial owners?

Formally the late Mr. Perry had declared to be the sole shareholder of the company, so – from a legal point of view – the shares in the Company fall under the UK Probate . . . (with my being responsible to declare all the assets as executor).[51]

As Neupert apparently understood matters, the Foundation did not acquire all of the Company's equity in 2013. Instead, Israel was the "sole shareholder" when he died, so "from a legal point of view," the shares became part of Israel's estate. If the Deed of Assignment had been valid, Neupert's statements could not have been true.

Three months later, in November 2015, Neupert sent a series of emails in which he reiterated his belief that Israel had continued to own all of the Company's equity and his expectation that it would pass to Lilly through the probate process. In an email dated November 23, 2015, Tamar's lawyer asked Neupert whether he had access to Israel's bank accounts.[52] Neupert responded as follows:

[A]s I indicated to Tami we first have to apply for probate and in this application we will have to list all personal assets of IIP (all bank accounts whether in the UK or worldwide as well as all the shares held by IIP, for instance the Cote d'Azur Real Estate LLC)[.]

---

[51] *Id.*

[52] Reply Ex. 3.

17

Then we can sort out the financial relations between the Estate of IIP and the Structure[.][53]

Two days later, Neupert dictated an email to Tamar, copying Naeff, Yadlin, and Duggan:

As your mother [Lilly] is still – until she has signed an Agreement renouncing some or all of her claims – the only heir to the UK assets of your father (including bank accounts and shares in companies held personally by your father), I have to answer her questions regarding the Will and the assets. The assets certainly include the shares in Cote d'Azur Real Estate LL.C. [sic].[54]

Both emails indicate that, as of November 2015, Neupert believed that Israel owned all of the equity of the Company when he died and that it would pass to Lilly in the probate proceeding. If the Deed of Assignment had been valid, these statements could not have been true.

Neupert appears to have continued to hold the same beliefs in March 2016, when he communicated with an attorney who was representing Israel's estate and the Company before the French tax authorities in proceedings regarding the Villa. In an email dated March 29, 2016, Neupert provided the attorney with the following information:

- You might know that the US has no such thing as a commercial registry – we are trying therefore to get a Certificate of Incumbency which would show that I am the legitimate Director of the company now (as Executor of the Last Will of Mr Perry).

- As this will take another few weeks, at present I could offer you a confirmation letter to the effect, that I, as Executor of the Last Will, can certify that Mr Perry was the owner of Cote d'Azur LLC from the

---

[53] *Id.* He also copied Naeff and Tamar.

[54] Reply Ex. 4.

incorporation until his death. If this would be helpful, maybe you can send me a draft in French which would satisfy the tax inspector.[55]

If the Deed of Assignment was valid, such that Israel did not own the shares when he died, then Neupert was proposing to give false information to the French tax inspector.

After the French attorney responded with questions, Neupert dictated and sent a response through his secretary on March 30, 2016. He copied Naeff and Tamar. In the email, Neupert stated the following:

- May I first of all point out that I have been involved in French/Spanish real estate investments for 40 years, that I have lectured on tax implications of cross border real estate investments and that I have won the first landmark case concerning the 3% flat tax at the Cour de Cassation back in 1983.

- So what I can offer for the time being, is a confirmation of the ownership of Mr. Perry in my capacity as Director of Cote d'Azure Estate LLC (I do not have to mention that Mr Perry has passed away because I hope to have the Certificate of Incumbency when the French tax inspector or inspectrice will be asking for it[)].

- I assume that you need an actual power of attorney by the Director of the company?

- Regarding the 3% declaration, I would be very cautious to make a false declaration concerning the ownership as of January 1, 2016 (I had a nasty experience in another case). I would say that as the ownership of the LLC was undetermined on Jan 1st 2016, it is actually still correct to mention that Mr Perry (or his estate) was the owner at the time. We can search for a possible position of the French Tax Authorities on this very specific case, but I would be surprised to find any. In any event, saying that Mrs Perry was the owner on Jan 1st 2016 is also probably a wrong statement, wouldn't it?

*   *   *

---

[55] Reply Ex. 6.

Summing up, I would suggest that you prepare a French declaration I can sign as Director and at the same time, I think you need a new power of attorney (it looks funny if I sign a Certificate as a Director and you are still using a PoA from a deceased person).[56]

Neupert's statements in this email are consistent with a belief that Israel owned the equity of the Company at his death such that the equity became part of his estate. They are inconsistent with the Foundation having owned the equity since 2013.

After receiving Neupert's response, the tax lawyer asked additional questions. At this point, Neupert shifted away from treating the shares as owned by the estate to embrace precisely the same position regarding ownership that Lilly has advanced in this proceeding:

> I told you that according to the Last Will of Mr Perry, his widow, Mrs Lilly Perry, is the sole heir to the LLC shares, so automatically upon the death she becomes the new owner (without any further legal action). In my opinion it would be a bad idea to say the estate is the owner, because then the tax office will immediately ask who the other family members might be in the hope of getting 40% inheritance tax from the daughters.[57]

If the Deed of Assignment was valid, then Neupert's description of Lilly's ownership position would have been false, and he would have been proposing to provide false information to the French tax authorities.

Tax counsel appears to have been concerned about making these representations to the French government. Tax counsel subsequently asked for confirmation that "Cote

---

[56] Reply Ex. 7, at 2-3. Neupert also copied Yadlin, Dugan, Naeff, and Tamar.

[57] *Id.* at 1. In a later exchange, Neupert also wrote, "As the Executor of the Last Will of Mr. Perry I can only reiterate that Mrs. Lilly Perry inherits the shares of the LLC." Reply Ex. 9, at 2.

d'Azur LLC was not contributed to the trust constituted by Mr Perry (to our knowledge this is not the case)."[58] In an email dated May 4, 2016, Neupert formally authorized tax counsel to "declare Lilly Perry as [the] only shareholder of the Cote d'Azur LLC by inheritance from her late husband Israel Perry according to his Last Will."[59] He also promised tax counsel that he would "be able to send you (within the next few weeks) a declaration signed by me as CEO of the LLC that Israel Perry was indeed the owner of the shares until his Death on 18 March 2015—you already have my confirmation as Executor of the Last Will."[60]

During his email exchanges with tax counsel, Neupert made reference to "further papers from Delaware."[61] Neupert later received "from Delaware" a document that could be provided to the French tax authorities to confirm that Neupert was authorized to speak on behalf of the Company.[62] The document was titled "Written Consent of Members of Cote D'Azue [sic] Estate LLC," was dated "as of March 30, 2016," would have appointed Neupert as a manager of the Company, and identified "Lilly Perry" as the sole member of the Company.[63] The plan to have Lilly execute a member consent as the sole

---

[58] Reply Ex. 9, at 4.

[59] *Id.* at 2.

[60] Reply Ex. 10, at 1.

[61] Reply Ex. 7, at 1.

[62] Reply Ex. 11, at 2.

[63] *Id.*

member of the Company "as of March 30, 2016" is inconsistent with the concept that Israel transferred his equity to the Foundation three years earlier.

Lilly alleges that she refused to sign the written consent. Consistent with her account, it is only at this point that Neupert and the representatives of the Foundation appear to have started treating the Foundation as the owner of the equity. The record contains an "unlimited power of attorney" that a Foundation representative executed on May 2, 2016 (the signature is illegible).[64] It granted Neupert the power to perform "all legal acts" including

> Extrajudicial representation; representation before all courts of law, administrative authorities, and arbitral tribunals; entry into agreements as to jurisdiction, including venue and arbitration agreements; filing appeals; issuing disclaimers; entering into settlements; acknowledging and withdrawing civil actions; executions of judgment and agreed settlements; receiving and issuing securities, payments, and other objects of litigation; instituting and conducting debt collection procedures, including the filing of creditor recovery actions; representation in inheritance matters, public registrations and recordings, and land registry matters; representation in criminal matters, in particular the institution/filing and withdrawal of criminal actions and demands for prosecution.[65]

Neupert used the authority granted by the power of attorney to execute the certificate of conversion on June 29, 2016.[66] It was filed on June 30.[67] He also used the authority

---

[64] Mot. Ex. E.

[65] *Id.*

[66] Resp. Ex. 3 ¶ 64.

[67] *See* Compl. ¶ 15 & Ex. C, at 1.

22

granted by the power of attorney to cause the filing of a new certificate of incorporation for the Company that authorized the issuance of up to 10,000 shares of common stock.[68]

The very next day, on July 1, 2016, Neupert convened an organizational meeting of the board of directors of the Company at his law offices in Switzerland.[69] According to the minutes, Neupert already was Chairman of the Board, an individual named Tanja Tandler already was the Secretary, and the two of them together constituted a quorum of the board of directors.[70] According to the minutes, they appointed Naeff, Oehri, and Giger as directors of the Company.[71] As noted, these three individuals were members of the board of the Foundation in 2013,[72] and Naeff was the individual who purportedly signed the Deed of Assignment on behalf of the Foundation. During the meeting, Neupert and Tandler issued 10,000 shares of Company stock to the Foundation.[73]

These documents provide substantial support for Lilly's contention that Israel's purported transfer of his member interest to the Foundation in 2013 is a recent invention. It is worth noting that it does not necessarily follow from the record that Neupert took

---

[68] Compl. ¶ 16 & Ex. C, at 4.

[69] Mot. Ex. F, at 1.

[70] *Id.*

[71] *Id.* at 2.

[72] *See* Resp. Ex. 2, at 2 (listing Oehri, Giger, and Naeff as members of board of Foundation); Mot. Ex. F, at 1 (appointing Oehri, Giger, and Naeff as directors).

[73] *See* Mot. Ex. A.

23

these actions to benefit himself personally. For example, Neupert appears to have taken alternative positions regarding ownership of the Company with the French tax authorities in an effort to help Israel's heirs avoid French taxes. It seems possible that he decided to take the position that the Foundation had acquired ownership of the Company in 2013 so that the equity of the Company would not become part of Israel's estate and subject to the claims of its creditors. At this preliminary stage, it is not possible to make definitive findings regarding the ownership of the Company or Neupert's actions and motives.

## II.     LEGAL ANALYSIS

Lilly has moved to join the Foundation as a counterclaim plaintiff pursuant to Rule 19(a). That rule states:

> *Persons to be joined if feasible*. A person who is subject to service of process and whose joinder will not deprive the Court of jurisdiction over the subject matter of the action shall be joined as a party in the action if
>
> (1) in the person's absence complete relief cannot be accorded among those already parties, or
>
> (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may
>
> (i) as a practical matter, impair or impede the person's ability to protect that interest or
>
> (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.
>
> If the person has not been so joined, the Court shall order that the person be made a party.

24

> If the person should join as a plaintiff but refuses to do so, the person may be made a defendant, or in a proper case, an involuntary plaintiff.[74]

Under Rule 13(h), Rule 19 applies equally to counterclaims and cross-claims.[75]

If the court concludes that a party should be joined under Rule 19(a), but joinder is not feasible, then Rule 19(b) calls upon to the court to "determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person thus regarded as indispensable."[76] Rule 19(b) provides "a non-exhaustive list" of factors for the court to consider when determining whether the action can proceed without the party's involvement.[77] This decision does not reach the issue raised by Rule 19(b) because it concludes that joinder is feasible.[78]

---

[74] Ct. Ch. R. 19(a) (formatting added).

[75] Ct. Ch. R. 13(h) ("Persons other than those made parties to the original action may be made parties to a counterclaim or cross-claim in accordance with the provisions of Rules 19 and 20.").

[76] Ct. Ch. R. 19(b).

[77] *Sample v. Morgan*, 914 A.2d 647, 674 (Del. Ch. 2007) (Strine, V.C.).

[78] *Hughes Tool Co. v. Fawcett Publications, Inc.*, 350 A.2d 341, 345-46 (Del. 1971) ("In the view we take of the case, [Rule 19(b)], which applies only when it has been shown that the person involved 'cannot be made a party,' is not relevant. There has been no showing that Hughes cannot be made a party and thus we do not reach the balancing test.").

## A.    The Foundation Should Be Joined.

Under Rule 19(a)(1), an absent party should be joined if "in the person's absence complete relief cannot be accorded among those already parties."[79] Under Rule 19(a)(2), an absent party also should be joined if "the person claims an interest relating to the subject of the action," and the disposition of the action may "(i) as a practical matter, impair  or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest."[80] The Foundation's claim to own all of the Company's equity as a result of the Deed of Assignment satisfies both criteria for purposes of the dispute in this case.

Delaware decisions recognize that when litigation places at issue the validity or enforceability of property rights, such as a party's rights under an agreement, then the holders of the property rights have an interest in the subject matter of the action such that they should be joined as parties.[81] In *Elster v. American Airlines, Inc.*, for example, this court stated that "[a]ll parties to a contract sought to be cancelled are indispensable parties to the suit for cancellation unless it is obvious that one not joined has no interest

---

[79] Ct. Ch. R. 19(a)(1).

[80] Ct. Ch. R. 19(a)(2).

[81] *See NuVasive, Inc. v. Lanx, Inc.*, 2012 WL 2866004, at *2-3 (Del. Ch. July 11, 2012) (holding that absent current and former employees were parties who should be joined in an action in which their former employer sued a third party for tortious interference with their employment agreements and sought a declaratory judgment regarding the breadth of restrictive covenants in the agreements).

whatever in the subject matter of the suit."[82] The court held that holders of options should be joined in a case where the plaintiff sought to cancel the options as void or to enjoin the issuance of shares under those agreements.[83] And this court stated flatly in *Hodson v. Hodson Corp.* that "[i]t is the rule, long settled in this state, that the owner of shares of stock in a Delaware corporation is an indispensable party to an action to cancel such shares . . . ."[84]

As Chancellor Allen explained, early Delaware decisions, like *Elster*, reasoned formalistically to declare parties "indispensable" based on their status.[85] The current rule calls for a more nuanced inquiry in which the court first determines whether an absent party should be joined under Rule 19(a) and then evaluates multiple factors under Rule 19(b) to determine whether the litigation should go forward when it is not feasible to join the absent party.[86] The multi-factor analysis under Rule 19(b) "has afforded courts the opportunity to consider a richer factual context in determining whether a party is dispensable or not," or, in other words, when determining whether the action can proceed

---

[82] 106 A.2d 202, 204 (Del. Ch. 1954).

[83] *Id.*

[84] 80 A.2d 180, 181 (Del. Ch. 1951) (citations omitted) (finding owner of shares was indispensable in action claiming that shares were issued fraudulently and seeking to require the surrender or cancellation of the shares).

[85] *Commonwealth Assocs. v. Providence Health Care, Inc.*, 1993 WL 432779, at *9 (Del. Ch. 1993) (Allen, C.). *See generally Federal Practice*, *supra*, § 1601 (describing history of Federal Rule of Civil Procedure 19 and effect of 1966 revisions to the rule).

[86] *Commonwealth Assocs.*, 1993 WL 432779, at *10-11.

notwithstanding the absence of a party that otherwise should be joined.[87] To my mind, the older cases remain informative for the first step of the analysis when assessing whether the absentee is a party that should be joined.

In this case, the Company's counterclaim seeks a declaratory judgment that the Deed of Assignment validly transferred all of the equity of the Company from Israel to the Foundation. Neupert's and the Company's second affirmative defense asserts the same thing. The counterclaim and the affirmative defense necessarily place at issue the validity of the Deed of Assignment and raise the question of who owned the shares. To grant the relief the Company seeks or to uphold the related affirmative defense, this court must hold that the Foundation is the owner of the shares. To deny the relief the Company seeks or to reject the related affirmative defense, this court must reject the Foundation's claim to the shares. Similarly, now that the defendants have introduced the Deed of Assignment into the litigation, if the court were to grant the relief that Lilly seeks, it necessarily would call into question the Deed of Assignment, because the relief Lilly seeks encompasses a determination that she owns all of the equity of the Company.

As a result, there is a substantial risk that the court cannot accord complete relief in the Foundation's absence. A ruling against the defendants and in favor of Lilly would determine that, as among them, and for purposes of Delaware law, Lilly owns the shares and, potentially, that the Company is still an LLC. That ruling would not bind the

---

[87] *Id.* at *10.

Foundation directly. Further proceedings would be required that would involve questions about the preclusive effect of this court's decision, among other matters. Even if not technically binding, a ruling may impair the Foundation's rights as a practical matter.[88] A ruling in favor of the defendants would avoid this problem, but the outcome of this litigation is far from clear. At this preliminary stage, there is meaningful contemporaneous evidence that supports Lilly's claims.

A decision against the defendants and in favor of Lilly will also, as a practical matter, impair or impede the Foundation's ability to protect its interests in the shares. Such a decision would call into question the Foundation's title to the shares. It also would leave the Company facing a substantial risk of incurring double or otherwise inconsistent obligations, because this court would have determined that Lilly owned the shares, yet the Foundation might still claim that it owned the shares. Once again, a ruling in favor of the defendants would avoid these problems, but it is not possible, at this preliminary stage, to predict how the litigation will unfold.

Because those tests under Rule 19(a) are met, the Foundation is a party that should be joined, if feasible.

---

[88] *See Federal Practice*, *supra*, §§ 1602, 1604.

**B.    The Foundation Is Subject To Service Of Process.**

The first sentence of Rule 19(a) limits the class of absent parties who "shall be joined as a party in the action" to those persons who are "subject to service of process."[89] Technically, Rule 19(a) speaks in terms of whether the absent party "is subject to service of process," not whether the absent party is subject to personal jurisdiction. The rule appears to contemplate that if service can be effected, then the absent party should be joined and served, at which point the absent party can raise Rule 12 defenses on its own behalf.

In this case, Lilly proposes to serve the Foundation under the Long-Arm Statute, which makes availability of service co-extensive with the question of personal jurisdiction. The Long-Arm Statute provides that a list of enumerated acts "constitute legal presence within the State."[90] The statute further provides that "[a]ny person who commits any of the acts hereinafter enumerated thereby submits to the jurisdiction of the Delaware courts."[91] The statute permits service of process on such a person in one of four ways:

> (1) By personal delivery in the manner prescribed for service within this State.

---

[89] Ct. Ch. R. 19(a).

[90] 10 *Del. C.* § 3104(b).

[91] *Id.*

(2) In the manner provided or prescribed by the law of the place in which the service is made for service in that place in an action in any of its courts of general jurisdiction.

(3) By any form of mail addressed to the person to be served and requiring a signed receipt.

(4) As directed by a court.[92]

Determining whether a Delaware court can exercise personal jurisdiction under the Long-Arm Statute requires a two-step analysis.[93] In the first step, the court must determine whether the plaintiff can satisfy the statutory requirements for the assertion of jurisdiction.[94] In the second step, the court must determine whether exercising personal jurisdiction over the defendant passes muster under the Due Process Clause of the United States Constitution.[95] To avoid due process problems, "a nonresident defendant must have sufficient 'minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"[96]

---

[92] *Id.* § 3104(d).

[93] *See Matthew v. Fläkt Woods Gp. SA*, 56 A.3d 1023, 1027 (Del. 2012).

[94] *Id.*

[95] *Id.*

[96] *Id.* (alteration in original) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

The Long-Arm Statute is to be "broadly construed to confer jurisdiction to the maximum extent possible under the Due Process Clause."[97] For purposes of the due process analysis, "[t]he well-established point of departure is that certain 'minimum contacts' must exist between a State and a nonresident defendant before that State can exercise personal jurisdiction over him."[98] The question is whether the defendants had sufficient minimum contacts with Delaware such that "compelling [them] to defend [themselves] in the State would be consistent with the 'traditional notions of fair play and substantial justice'."[99]

The Delaware Supreme Court has adopted what is known as the conspiracy theory of jurisdiction.[100] Under this theory,

> a conspirator who is absent from the forum state is subject to the
> jurisdiction of the court, assuming he is properly served under state law, if
> the plaintiff can make a factual showing that: (1) a conspiracy to defraud

---

[97] *Hercules Inc. v. Leu Tr. & Banking (Bah.) Ltd.*, 611 A.2d 476, 480 (Del. 1992); *accord LaNuova D & B, S.p.A. v. Bowe Co., Inc.*, 513 A.2d 764, 768 (Del. 1986); *see also Sample v. Morgan*, 935 A.2d 1046, 1056 (Del. Ch. 2007) (Strine, V.C.) ("[T]rial courts must give a broad reading to the terms of the long-arm statute, in order to effectuate the statute's intent to ensure that this state's court may exercise jurisdiction to the full limits permissible under the Due Process Clause. In other words, the Supreme Court has instructed that trial courts should permit service under § 3104 if the statutory language plausibly permits service, and rely upon a Due Process analysis to screen out uses of the statute that sweep too broadly." (footnote omitted)).

[98] *Moore v. Little Giant Indus., Inc.*, 513 F. Supp. 1043, 1048 (D. Del. 1981) (quoting *Int'l Shoe*, 326 U.S. at 316), *aff'd*, 681 F.2d 807 (3d Cir. 1982).

[99] *Waters v. Deutz Corp.*, 479 A.2d 273, 276 (Del. 1984) (quoting *Int'l Shoe*, 326 U.S. at 316).

[100] *Fläkt Woods*, 56 A.3d at 1027.

existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.[101]

The theory "is based on the legal principle that one conspirator's acts are attributable to the other conspirators."[102] Thus, "if the purposeful act or acts of one conspirator are of a nature and quality that would subject the actor to the jurisdiction of the court, all of the conspirators are subject to the jurisdiction of the court."[103]

Delaware decisions have not explained consistently how the conspiracy theory corresponds to the two-prong jurisdictional test.[104] In my view, the five elements of the *Istituto Bancario* test functionally encompass both prongs of the jurisdictional test. The first three *Istituto Bancario* elements address the statutory prong of the test. The fourth and fifth *Istituto Bancario* elements address the constitutional prong of the test.[105]

---

[101] *Istituto Bancario Italiano SpA v. Hunter Eng'g Co.*, 449 A.2d 210, 225 (Del. 1982).

[102] *Fläkt Woods*, 56 A.3d at 1027.

[103] *Istituto Bancario*, 449 A.2d at 222.

[104] *See* Donald J. Wolfe & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 3.04[b] (2012) (describing approaches).

[105] *See Virtus Capital L.P. v. Eastman Chem. Co.*, 2015 WL 580553, at *12 (Del. Ch. Feb. 11, 2015).

The first three *Istituto Bancario* elements encompass the statutory prong by speaking to the requirements of the Long-Arm Statute. The statute provides for jurisdiction in circumstances that include the following:

> (c) As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:
>
> (1) Transacts any business or performs any character of work or service in the State;
>
> (2) Contracts to supply services or things in this State;
>
> (3) Causes tortious injury in the State by an act or omission in this State . . . .[106]

"[A] single transaction is sufficient to confer jurisdiction where the claim is based on that transaction."[107] The third *Istituto Bancario* element—whether a "substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state"—corresponds with the statutory availability of jurisdiction over a party that has transacted business in the state, performed work in the state, or caused tortious injury in the state through an act or omission in the state.

---

[106] 10 *Del. C.* § 3104(c)(1)-(3).

[107] *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 978 (Del. Ch. 2000) (internal quotation marks omitted) (quoting *Kahn v. Lynch Commc'n Sys.*, 1989 WL 99800, at *4 (Del. Ch. Aug. 24, 1989)); *accord LaNuova*, 513 A.2d at 768.

The plain language of the Long-Arm Statute recognizes that forum-directed activity can be accomplished "through an agent."[108] The first and second *Istituto Bancario* elements—the existence of a conspiracy and the defendant's membership in it—provide grounds for imputing the jurisdiction-conferring act to the defendant under agency principles, because "conspirators are considered agents for jurisdictional purposes."[109]

It remains true that the conspiracy theory itself is not an independent basis for jurisdiction that alleviates the need to establish a statutory hook in Section 3104.[110] But the first, second, and third *Istituto Bancario* elements correspond sufficiently with the requirements of Section 3104 such that satisfying the former accomplishes the latter.

Analytical overlap is equally present for the constitutional prong. The fourth and fifth *Istituto Bancario* elements—whether the defendant "knew or had reason to know of" the forum-directed activity and the degree to which the forum-directed activity was "a direct and foreseeable result of the conduct in furtherance of the conspiracy"—speak to due process and whether there are sufficient minimum contacts between the defendant and the forum such that the defendant could reasonably anticipate being sued there.[111]

---

[108] 10 *Del. C.* § 3104(c).

[109] *Hercules*, 611 A.2d at 481; *accord Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1995 WL 694397, at *12 (Del. Ch. Nov. 21, 1995) (Allen, C.).

[110] *Hercules*, 611 A.2d at 482 n.6.

[111] *See Carlton Invs.*, 1995 WL 694397, at *12.

[A] defendant who has so voluntarily participated in a conspiracy with knowledge of its acts in or effects in the forum state can be said to have purposefully availed himself of the privilege of conducting activities in the forum state, thereby fairly invoking the benefits and burdens of its laws.[112]

The "participation is a substantial contact with the jurisdiction of a nature and quality that it is reasonable and fair to require the defendant to come and defend an action there."[113]

In my view, therefore, if a plaintiff can address satisfactorily all five elements of the conspiracy theory, then the plaintiff will have met both prongs of the jurisdictional test. This decision therefore uses the conspiracy theory as the framework for analysis.

### a.    The Foundation's Role In The Conspiracy

The first and second *Istituto Bancario* elements ask whether a conspiracy existed and whether the defendant was a member of the conspiracy.[114] Although *Istituto Bancario* literally speaks in terms of a "conspiracy to defraud," the principle is not limited to that particular tort.[115]

---

[112] *Istituto Bancario*, 449 A.2d at 225.

[113] *Id.*; *accord Hercules*, 611 A.2d at 482 n.6 (explaining that the conspiracy theory "provides a framework with which to analyze a foreign defendant's contacts with Delaware").

[114] 449 A.2d at 225.

[115] *See id.* at 222-25 (describing underlying theory without fraud-based limitation); *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 635-36 (Del. Ch. 2013) (noting that conspiracy theory encompasses claims for breach of fiduciary duty and aiding and abetting); *Hamilton P'rs, L.P. v. England*, 11 A.3d 1180, 1197 (Del. Ch. 2010) (same); *Crescent/Mach*, 846 A.2d at 977 (rejecting construction of *Istituto Bancario* that would require a "specific allegation that [the defendants] agreed to conspire 'to defraud' minority stockholders").

For jurisdictional purposes, the record at this preliminary stage provides adequate support for Lilly's claim that Neupert and the Foundation engaged in a conspiracy to deprive her of her ownership interest in the Company.[116] The record indicates that, until as late as March 2016, both Neupert and representatives of the Foundation believed that Israel was the sole member of the Company when he died on March 18, 2015, and that Lilly stood to inherit sole ownership of the Company as his only heir. At best for the defendants, Neupert took inconsistent positions as to whether (i) Lilly automatically became the owner of the membership interest when Israel died or (ii) the membership interest became the property of Israel's estate and would pass to Lilly through probate.[117] What Neupert did not say is that the Foundation had owned the membership interest since March 2013. To the contrary, when asked about the Deed of Assignment just two weeks after Israel's death, a Foundation representative stated, "[t]his assignment is known to us,

---

[116] The defendants contend that this court can consider only the allegations in Lilly's complaint when evaluating jurisdiction. Doing so would be inequitable because the existence of the Deed of Assignment is an affirmative defense that the defendants raised, and the counterclaim for a declaratory judgment establishing the validity of the Deed of Assignment is something the Company asserted. Regardless, when evaluating a Rule 12(b)(2) motion asserting lack of jurisdiction, the court is not limited to the allegations of the complaint and can consider other evidence of record. *See, e.g.*, *Hart Hldg. Co., Inc. v. Drexel Burnham Lambert, Inc.*, 593 A.2d 535, 538-39 (Del. Ch. 1991) (Allen, C.). In my view, the current situation calls for the same approach.

[117] *See* Reply Ex. 7, at 2 & Ex. 9, at 2.

but it was never executed as far as we are aware . . . . Who can inform us about the actual shareholders/directors of Cote d Azure?"[118]

But, after Lilly declined to execute the member consent that would have made Neupert a manager of the Company, it appears that Neupert and the Foundation decided to create some alternative facts. At this point, the Foundation executed an unlimited power of attorney, dated May 2, 2016, that purported to grant Neupert authority to act on behalf of the Company. On June 29 and 30, Neupert used that authority to execute and cause to be filed the certificate of conversion that named him as President of the Company and a certificate of incorporation for the Company that authorized the issuance of 10,000 shares. On July 1, Neupert convened a meeting of the board of directors of the Company at which he and a colleague (i) appointed three representatives of the Foundation as directors of the Company and (ii) issued all 10,000 shares to the Foundation.

This course of conduct supports a reasonable inference that the Foundation and Neupert conspired to deprive Lilly of her interest in the Company. In the five counts of her complaint, Lilly pleads theories by which Neupert's actions constituted tortious conduct, with the two most obvious being fraud and conversion.[119] The documentary record as a whole, as well as the timing and results of Neupert's actions, support a

---

[118] Reply Ex. 1.

[119] *See* Compl. ¶¶ 24-29, 40-43.

38

reasonable inference that the Foundation acted in concert with Neupert. The Foundation purported to give him the authority to act, and it received the benefit of his actions. For purposes of the conspiracy theory of jurisdiction, Lilly has provided sufficient basis to believe that Neupert and the Foundation conspired to engage in tortious conduct.

### b. The Forum-Related Acts

The third *Istituto Bancario* element asks whether "a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state."[120] Filing a corporate instrument in Delaware to facilitate the challenged transaction satisfies this element.[121]

The record plainly reflects that Neupert engaged in Delaware-directed activity sufficient to satisfy the third *Istituto Bancario* element and to provide the statutory prerequisite for jurisdiction under Section 3104(c)(1). Neupert signed the certificate of conversion and caused it to be filed with the Delaware Secretary of State. This act converted the Company from an LLC to a corporation and purported to recognize

---

[120] 449 A.2d at 225.

[121] *See, e.g.*, *Fläkt Woods*, 56 A.3d at 1027 (certificate of cancellation); *Carsanaro*, 65 A.3d at 635 (various certificates required by Delaware General Corporation Law for challenged transactions, including certificates of amendment, certificates of designation, certificates of correction, and certificate of cancellation); *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 2005 WL 583828, at *8 (Del. Ch. Feb. 4, 2005) (certificate of designations); *Gibralt Capital Corp. v. Smith*, 2001 WL 647837, at *6 (Del. Ch. May 9, 2001) (certificate of designations); *Crescent/Mach*, 846 A.2d at 977 (certificate of merger). *See generally* 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 13.4[B] (3d ed. 2014) ("[t]he filing of corporate instruments with the Delaware Secretary of State may also constitute an action in Delaware sufficient to support jurisdiction").

Neupert as the President of the Company. Neupert also caused the filing of a certificate of incorporation for the Company that authorized the issuance of up to 10,000 shares of common stock. Neupert then used the authority ostensibly provided by these certificates to convene a meeting of the board of directors of the Company. At that meeting, he and a colleague purported to issue all 10,000 shares of the Company to the Foundation and to appoint three Foundation representatives as directors.

Neupert has suggested that, because a registered agent actually filed the certificates, the filings cannot be attributed to him for jurisdictional purposes. It is reasonably inferable that the services company acted as Neupert's agent. The plain language of the Long-Arm Statute recognizes that forum-directed activity can be accomplished "through an agent."[122]

### c. The Foundation's Knowledge Of The Forum-Related Acts

The fourth and fifth *Istituto Bancario* elements evaluate whether "the defendant knew or had reason to know of the act in the forum state" and the degree to which "the act in . . . the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy."[123] In substance, these elements require allegations "from which one can infer that a foreign defendant knew or should have known that the conspiracy would

---

[122] 10 *Del. C.* § 3104(c).

[123] 449 A.2d at 225.

40

have a Delaware nexus."[124] Actual knowledge is not required; "the applicable standard is whether the foreign [defendant] knew or should have known [about the] activity in Delaware."[125]

At the current procedural stage, it is readily inferable that the Foundation knew or should have known about Neupert's forum-directed activity. The Company was a Delaware entity, and the emails that Lilly has submitted reflect that the Foundation representatives had longstanding knowledge of its existence and status. Foundation representatives sent emails addressing the ownership of the Company, and they were copied on emails in which Neupert expressed his views about the ownership of the Company. Until Lilly refused to sign the member consent, both Neupert and the Foundation representatives held the view that Israel owned all of the Company's equity when he died. After the dispute with Lilly arose, the Foundation granted Neupert an "unlimited power of attorney" that gave Neupert the power to perform "all legal acts" including "[e]xtrajudicial representation" and "representation in . . . public registrations and records."[126] The power of attorney referred to the Company as "Cote d'Azur Estate LLC/Corp., Delaware."[127] This reference indicates *both* that the Foundation knew the Company was a Delaware entity *and* that Neupert planned to use his authority to convert

---

[124] *Fläkt Woods*, 56 A.3d at 1024.

[125] *Id.*

[126] Mot. Ex. E.

[127] *Id.*

41

the Company from an "LLC" into a "Corp." After doing so, Neupert convened a meeting of the board of the Company at which he and a colleague issued all of the Company's equity to the Foundation and appointed three representatives of the Foundation as directors of the Company. Under the circumstances, it is reasonable to infer that the Foundation knew or should have known that Neupert would be making a filing with the Delaware Secretary of State to convert the Company from an LLC to a corporation.

## C. The Foundation Shall Be Joined As A Party.

Rule 19(a) states that if an absent party should be joined under Rule 19(a), but "the person has not been so joined," then "the Court shall order that the person be made a party."[128] This decision has concluded that the Foundation should be joined and that the Foundation is subject to service under the Long-Arm Statute. Because Lilly is the party who wishes to add the Foundation, it makes sense for her to take the steps necessary to serve the Foundation with process.

Lilly contends that the Foundation should be added as a counterclaim plaintiff. Rule 19(a) states that "[i]f the person should join as a plaintiff but refuses to do so, the person may be made a defendant, or in a proper case, an involuntary plaintiff."[129] The logical role for the Foundation is indeed as a counterclaim plaintiff asserting the same claim as the Company regarding the validity of the Deed of Assignment. If the

---

[128] Ct. Ch. R. 19(a).

[129] *Id.*

42

Foundation refuses to join as a plaintiff, then Lilly will add the Foundation as a relief defendant. If she wishes, Lilly can seek to have the Foundation realigned as a counterclaim plaintiff.[130]

Lilly has sought to join the Foundation as an involuntary plaintiff. That issue is not yet ripe. As noted, Rule 19(a) limits the availability of that relief to "a proper case," which is a term of art under the rule. [131] When the involuntary-plaintiff doctrine applies, it provides a separate and independent basis for this court to exercise personal jurisdiction.[132] To invoke that doctrine, the absent party should not otherwise be subject to jurisdiction.

Whether this is "a proper case" for adding the Foundation as an involuntary plaintiff presents an interesting question. At present, however, the court need not decide it, because it appears that the Foundation is subject to service of process under the Long-Arm Statute. If the Foundation demonstrates that it is not otherwise possible to effect service on or exercise jurisdiction over the Foundation, then Lilly may renew her request.

## III.    CONCLUSION

The Foundation is a party which should be joined for a just resolution of this dispute. For purposes of Lilly's claims, the Foundation can be served under the Long-Arm Statute. Lilly shall add the Foundation as a relief defendant, subject to the

---

[130] *See Federal Practice*, *supra*, § 1605; Rydstrom, *supra*, § 2.

[131] *See* Rydstrom, *supra*, § 2; *Federal Practice*, *supra*, § 1606.

[132] *See, e.g.,* Entman, *supra*, at 27 n.108.

Foundation being realigned for good cause shown as a counterclaim plaintiff. If warranted, Lilly can renew her request to have the Foundation added as an involuntary plaintiff, provided that Lilly can show that this is "a proper case" within the meaning of Rule 19(a).